CANCER RESEARCH INSTITUTE,
INC., Plaintiff,

v.

CANCER RESEARCH SOCIETY,
INC., Defendant.

No. 87 Civ. 6831 (JFK).

United States District Court,
S.D. New York.

Aug. 16, 1990.

Patterson, Belknap, Webb & Tyler (Thomas C. Morrison, Eric Wertheim, of counsel), New York City, for plaintiff.

Skadden, Arps, Slate, Meagher & Flom (Miriam L. Siroky, Susan R. Reiss, David W. Lamb, of counsel), New York City, for defendant.

## OPINION and ORDER

KEENAN, District Judge:

### BACKGROUND

This action in which plaintiff sought to protect the exclusivity of its tradename was the subject of a prior decision where this Court permanently enjoined defendant from using the name Cancer Research Society or any other name confusingly similar to plaintiff's name. *See Cancer Research Inst. v. Cancer Research Soc'y*, 694 F.Supp. 1051 (S.D.N.Y.1988). The facts underlying the case are fully depicted in that decision, familiarity with which is assumed, and will not be recounted except to the extent necessary to this decision. Plaintiff now seeks an order adjudging defendant in civil contempt for violating the terms of the Judgment and Permanent Injunction of April 29, 1988, which embodied the decree of this Court's decision. Plaintiff also requests attorney's fees because it contends the alleged contumacy was willful. For the reasons discussed below, the Court finds defendant is in contempt and orders discovery on the issue of damages. The Court declines to award attorney's fees and costs.

### FACTS

The Judgment and Permanent Injunction entered by this Court on April 29, 1988 permanently enjoined defendant "from listing or advertising itself in any telephone directory in the United States under the name Cancer Research Society...." Inj. ¶ 2. The Court instructed defendant to notify before June 1, 1988 the publishers of all directories in which the offending listing had already appeared, or in which it was about to appear and could not be halted, that the listing must be deleted from all future directories. *Id.* ¶ 4. Paragraph 3 of the injunction required the defendant to "take immediate steps to attempt to secure the withdrawal of any such listings which were placed prior to April 19, 1988," and were slated to appear in directories which had "not yet reached their closing dates."

When plaintiff initially brought this motion, it adduced evidence of 10 instances of purported violations of the April 29 injunction. This figure swelled to 178 violations in plaintiff's estimation by the time the extensive submissions were entirely before the Court.

### The Purported Violations

Plaintiff claims that defendant's failure to secure the timely deletion of prohibited listings from numerous directories published between late 1988 and late 1989 warrants a finding of contempt. Paragraphs 1 and 2 of the December 21, 1989 affidavit of Thomas C. Morrison display 55 instances[1] where the prohibited listing appeared in directories issued between September 1988 and October 1989. Alongside nearly all of the alleged violations plaintiff supplies the date on which *it* placed an order for a listing in the directories where defendant's prohibited listing appears. The vast majority of plaintiff's listings were placed after April 29, 1988. Plaintiff asserts that "the closing date for telephone directories ranges from three to six months prior to the date of publication." Morrison Aff. of April 24, 1989 at ¶ 4. Thus, plaintiff points out, a "February directory may have closed as late as November, and certainly would have closed no earlier than September—some *five months* after defendant was ordered to cease all such listings and to "take immediate steps" to remove any such listings which had previously been placed (Injunction, ¶ 3)." *Id.* (emphasis in original)

To bolster its assertions of non-compliance, plaintiff surveyed 15 directory companies, responsible for the publication of 39 directories containing the prohibited listing, to determine whether they received cancellation orders from defendant and, if so, whether the cancellation orders were received in time to delete defendant's listings from directories that were still open when the Court issued its injunction. The results of this survey, which are compiled in the affidavit of Eric Wertheim, reveal "that no record of formal cancellation order [prior to

---

**1.** The affidavit purports to reveal 56 instances of noncompliance. In a letter dated February 21, 1990, however, the affiant agrees to withdraw one asserted instance.

late 1989] . . . could be found for 33 directories. Cancellation orders were found for five directories but they were received anywhere from 18 days after the effective closing date to approximately four months after the *publication* date." Wertheim Aff. ¶ 13 (emphasis in original). Moreover, the survey "could not verify a single instance where defendant secured the cancellation of its listing in a book that had not closed as of the date the injunction issued." *Id.*

### Defendant's Compliance Efforts

Defendant concedes, as it must, that listings have appeared which violate the terms of the injunction. Defendant seeks, however, to lay the entire blame at the feet of its advertising agency, American Ad Management ("AAM") or the individual directories it maintains published the prohibited listing despite cancellation orders. Indeed, defendant claims it was unaware that any of its cancellation orders were ineffectual until it received plaintiff's contempt motion papers. Kip Sturgeon, an employee of defendant, declares that:

"Following the issuance of the injunction, I immediately sent a copy to Judy Leverich at American Ad Management, the advertising agency responsible for placing the Society's telephone directory listings. Before I sent it to her, I spoke to her by telephone, and advised her of the terms of the injunction. I recall stressing to her that cancellation notices would have to be sent out no later than June 1, 1988."

Sturgeon Aff. of June 3, 1989. Defendant needed to rely upon AAM to cancel the listings because directories do not deal directly with advertisers. *See* Taylor Aff. ¶ 10. Sturgeon also asserts that defendant's telephones were disconnected between May 1988 and January 1989, and that defendant placed no new telephone listings or advertisements soliciting funds after mid-June 1988. *See* Sturgeon Aff. of May 10, 1989 at ¶ 5.

Judy Leverich, AAM's former coordinator responsible for cancelling telephone directory listings, sent a "Form 3235," the acknowledged form for cancelling tele-

phone directory listings, to various directory publishers to cancel approximately 150 listings for the name Cancer Research Society. She believes that the "vast majority" of the cancellations were effective, and assumes that error on the publishers' part caused the instances where the cancellations were not honored. *See* Leverich Aff. ¶¶ 3, 6.

In further support of its compliance efforts, defendant submits three large binders containing 196 so-called "tear sheets" from current (1989–1990) directories around the nation, which demonstrate that the name Cancer Research Society has been excised from the current edition of these directories. Plaintiff argues that rather than strengthening defendant's position, these voluminous exhibits cause defendant to fall on Scylla in trying to avoid Charybdis. Had defendant removed the prohibited listing from the directories published in late 1988 and early 1989, plaintiff submits, it would have produced evidence of those deletions in opposition to plaintiff's motion. The failure to do so, plaintiff urges, gives rise to the inference that the prohibited listing continued to appear in those 1988–1989 directories in contravention of the injunction.

Defendant responds, without further explanation, that it "made a deliberate choice to submit to the Court *only* current directories, not specifically the first directory evidencing the implementation of a change or deletion." Siroky Letter of March 2, 1990 at p. 2 (emphasis in original). In any event, defendant continues, 128 of the 196 exhibits include paid advertising requests which were submitted for a 1988 directory issue date, giving rise to the contrary inference that defendant ordered the prohibited listing deleted in 1988.

### DISCUSSION

 A party may be held in civil contempt "only if there is a clear and unambiguous order, noncompliance is proved clearly and convincingly, and 'the defendant has not been reasonably diligent and energetic in attempting to accomplish what was ordered.'" *Drywall Tapers, Local*

*1974 v. Local 530*, 889 F.2d 389, 394 (2d Cir.1989) (citation omitted); *see Charles of the Ritz Group Ltd. v. Quality King Distrib., Inc.*, 664 F.Supp. 152, 154 (S.D.N.Y.), *aff'd*, 832 F.2d 1317 (2d Cir.1987). The sanction imposed on a civil contemnor should be calculated to advance either (or both) of two ends: to coerce future compliance with the court's order or to compensate the complainant for losses stemming from the contemnor's past noncompliance. *See Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53, 56–57 (2d Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982); *Vuitton et Fils, S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979); *United States v. International Bhd. of Teamsters*, 726 F.Supp. 943, 949 (S.D.N.Y.1989). Punishment of the contemnor is not a proper purpose of a civil contempt sanction. *See Manhattan Indus. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990).

■ Sanctions can be imposed "without a finding of wilfullness." *Canterbury Belts, Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 39 (2d Cir.1989) (citations omitted). The contemnor's intent, however, may be considered in fashioning an appropriate remedy. *See Vuitton*, 592 F.2d at 130–31. Guided by these principles, the Court turns to plaintiff's application.

The Court deems it useful at the outset to address the significance of the 196 "tear sheets" from current directories submitted by defendant. While the exhibits effectively parry the contention that a remedy to coerce future compliance is appropriate, they do little to rebut plaintiff's central assertion that the prohibited listing appeared in numerous 1988–1989 directories.

■ Defendant's argument that the prohibited listings must have been removed from most of the 1988–89 directories because it submitted 128 paid advertising requests and 82 "Form 3235's" for directories having 1988 issue dates is without force. First, an advertising request unaccompanied by a "Form 3235" does not cancel a regular listing—it merely downgrades a bold or superbold listing to a regular print listing. *See* Glick Aff. ¶¶ 3–5. Further, many of the first 196 exhibits lack any "Form 3235" cancellation order for 1988 or are accompanied by "Form 3235's" mailed so close to the reported "due order" date to render untimely processing by the publisher a distinct possibility. Finally, the Court issued the injunction in late April 1988. Evidence that a "Form 3235" was submitted in 1988 does not establish immediate compliance with the Court's decree.

On the other hand, when governed by the clear and convincing evidence standard, the Court disagrees with plaintiff's assertion that defendant's submission of "tear sheets" for 1989–1990 directories compels the conclusion that the prohibited listing appeared in each corresponding 1988–1989 directory. This ruling, however, in no way diminishes the significant evidence of noncompliance with the Court's injunction.[2]

Plaintiff identifies no fewer than 66 instances where the prohibited listing appeared in editions of directories which were published at a time when the deletion would have been effected had defendant acted to ensure compliance with the injunction. *See* Morrison Aff. of December 21, 1989; Morrison Letter of February 21, 1990 at p. 13. Paragraph 4 of the injunction required defendant to delete its old telephone listings by sending out notices to directories "on or before June 1, 1988." It cannot be seriously urged that defendant complied with this instruction. AAM, defendant's advertising agency, mailed the majority of the cancellation notices at the end of August 1988, and some as late as September 1989. *See* Wertheim Aff. ¶ 5. Moreover, it appears that AAM's practice was to wait until about five days before the deadline for accomplishing directory changes, creating the risk that the cancellation would not arrive in time to achieve deletion.

■ The Court cannot accept defendant's assertion in the Leverich affidavit

---

2. The parties do not question the clarity of the injunction. Thus, the Court will dispense with discussion of that element of the civil contempt inquiry.

that a directory's due date is of no moment provided a cancellation request is received within seven days after the closing date. That the prohibited listing continued to appear in so many directories which were sent cancellation orders perilously close to the deadline for receiving the orders belies the assertion. The conclusion is inevitable that untimely transmission of cancellation orders resulted in many instances of noncompliance with the injunction.[3]

Defendant thus may be held in contempt if it has not been reasonably diligent and energetic in attempting to accomplish the ordered deletions. Defendant points out that it engaged an advertising agency which it reasonably believed would carry out the requirements of the injunction. It contends that it had no reason to believe anything was amiss because AAM personnel assured Kip Sturgeon that his instructions were being carried out. The record reveals, however, that defendant failed " 'to energetically police compliance' with the" injunction. *Manhattan Indus., supra*, 885 F.2d at 5 (quoting 1 J. Gilson, *Trademark Protection and Practice*, § 8.07[5], at 8–169 (1988)). Indeed, its efforts were lax.

Defendant's end compliance program consisted of mailing a copy of the injunction to AAM after Kip Sturgeon, who is not a lawyer, advised Judy Leverich of the terms of the injunction by telephone. Defendant does not claim that it provided AAM any instructions on how and when the injunction was to be carried out, an omission which goes far to explain why so many of the cancellation orders were dispatched far after June 1, 1988.

No indication is in the record that defendant ever followed up on what AAM was doing to comply with the injunction. Even a cursory telephone call to AAM months after the injunction was relayed would have divulged the torpid manner in which cancellation orders were being mailed and would likely have averted a substantial

number of prohibited listings. The slightest follow-up would have disclosed to defendant AAM's knowledge "that telephone publishers receive thousands of these forms [cancellations] *and apparently cannot handle the volume of these confirmations.*" Taylor Aff. ¶ 13. This revelation certainly would have unsettled a party subject to the constraints of a federal court permanent injunction.

Even more startling is defendant's failure to undertake serious policing action in the face of an expanding body of obvious violations of the Court's decree. For example, two of the directories plaintiff identified in June 1989 as carrying the prohibited listing still had no record of cancellation orders as late as November 1989.

Defendant "failed to develop and implement a 'thorough, considered ... plan of attack on compliance' " which would have averted the violations of the injunction. *Manhattan Indus.*, 885 F.2d at 4. Further, as in *Manhattan Indus.*, there has been " 'little follow-through once initial instructions' " were given to agents. *Id.* Having found clear and convincing proof of numerous violations of the Court's injunction occasioned by defendant's lack of diligence, the Court finds that defendant is in contempt.

As discussed *supra* at 529, contempt sanctions may be imposed either to coerce the contemnor into future compliance or to compensate the complainant for loss stemming from the contumacy. The record does not reveal that defendant continues to violate the injunction. Although its compliance was late, its exhibits display current compliance. Coercion is not called for here.

■ Sanctions must be imposed, however, "once the plaintiff has proved that he has suffered harm because of a violation of the terms of the injunction." *Vuitton et Fils S.A.*, 592 F.2d at 130. Proof of actual

---

3. The Court observes that the extent of defendant's noncompliance may be far greater than the instances plaintiff has uncovered. In its initial wave of submissions to the Court, defendant asserted that it had cancelled 150 listings displaying the prohibited name. The number reached 261 by the time briefing was concluded. It is unclear when these additional cancellations were accomplished.

damages, of course, is a precise guide in determining the appropriate award for complainant. *See Powell v. Ward,* 643 F.2d 924, 934 (2d Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). Plaintiff adduces no evidence of actual damages resulting from defendant's continued use of the prohibited listing after the injunction issued. Defendant asserts that plaintiff's inability to demonstrate actual loss forecloses more than nominal recovery. The Court disagrees.

"[A] civil contempt fine is not always dependent on a demonstration of 'actual pecuniary loss.'" *Manhattan Indus.,* 885 F.2d at 5 (citation omitted). In circumstances where "'it seems obvious that there must have been some economic injury to [plaintiff]'...., under a theory of unjust enrichment, a contempt plaintiff is entitled to defendant's profits without submitting proof of direct injury." *Id.* at 6 (citations omitted). Here, the Court has already found that the prohibited listing caused a substantial diminution in plaintiff's contributions in 1987 and 1988. *See Cancer Research, supra,* 694 F.Supp. at 1054. No principled reason appears in the record to not extend this finding to revenue generated from listings in 1988–1989 directories.

In plaintiff's earlier submissions, it requested $2,400 per violation. Without a factual predicate, plaintiff characterized this figure as a) an approximation of plaintiff's losses per prohibited listing; or b) defendant's unjust enrichment per listing. As the number of documented instances of violations grew to 178 in plaintiff's estimation, plaintiff submitted the appropriate sanction to the Court's discretion. The Court, however, knows of no authority for plaintiff's suggestion when the contempt sanction is calculated to compensate the plaintiff's loss. The law is clear that the Court possesses broad discretion to fashion a monetary remedy only where the purpose of the sanction is coercive. *See Perfect Fit Indus., supra,* 673 F.2d at 57.

When actual loss cannot be demonstrated, plaintiff is entitled to compensatory damages under an unjust enrichment theory. There, plaintiff may recover defendant's net profits derived from the continued use of the prohibited listing after the injunction issued. *See Manhattan Indus.,* 885 F.2d at 7. The Court presently is unable to compute what profits defendant derived from the presence of the prohibited listing in directories after the injunction issued. Plaintiff must conduct discovery on this issue. Accordingly, plaintiff shall complete discovery on the question of what portion of defendant's net profits it is entitled to for the period after the injunction's issuance through the last date a then-current directory carried the prohibited listing.

Plaintiff seeks to recover attorney's fees and its costs in prosecuting this motion. A complainant may not be awarded attorney's fees and costs absent a showing the contumacy was willful. *See Manhattan Indus.,* 885 F.2d at 8. The record does not disclose any deliberateness on defendant's part in the continued appearance of the prohibited listing. The Court declines to award attorney's fees.

## CONCLUSION

For the reasons developed above, the Court finds defendant in contempt. Plaintiff is to complete discovery on the damages issue within 60 days of this decision. The Court declines to award attorney's fees and costs. The parties are to appear for a conference on October 22, 1990 at 10:30 a.m. in courtroom 228.

SO ORDERED.