**The UPJOHN COMPANY, Plaintiff,**

v.

**MEDTRON LABORATORIES, INC.,
Anthony Imbriolo and Dominick J.
Carlisi, M.D., P.C., Defendants.**

**No. 87 Civ. 5773 (SWK).**

United States District Court,
S.D. New York.

July 19, 1995.

---

Kenyon & Kenyon by Alan T. Bowes, Richard L. DeLucia, Richard S. Gresalfi, Andrea H. Scheidt, New York City, for plaintiff.

Cooper & Dunham by Lewis H. Eslinger, Wendy E. Miller, New York City, for defendants.

## *MEMORANDUM OPINION AND ORDER*

KRAM, District Judge.

In this patent infringement action, plaintiff The Upjohn Company ("Upjohn") moves for an order holding defendants in contempt of the preliminary and permanent injunctions issued by this Court on October 12, 1990 and November 17, 1992, respectively. For the reasons set forth below, Upjohn's motion is granted.

### BACKGROUND

As this matter has been before this Court on earlier occasions, the facts of the parties' dispute already have been chronicled. *See Upjohn Co. v. Medtron Lab.*, 751 F.Supp. 416 (S.D.N.Y.1990), *aff'd*, 937 F.2d 622 (Fed.Cir. 1991) (*"Upjohn I "*); *Upjohn Co. v. Medtron Lab.*, 800 F.Supp. 1181 (S.D.N.Y.1992), *aff'd*, 5 F.3d 1504 (Fed.Cir.1993) (*"Upjohn II "*). Accordingly, only those facts necessary to a

resolution of Upjohn's contempt motion will be set out here.

## I. The Injunctions

In 1979, Upjohn, a pharmaceutical corporation, received United States Patent No. 4,139,619 for minoxidil, a chemical composition intended for use as a topical treatment for male pattern baldness. Subsequently, in 1986, the United States Patent and Trademark Office issued United States Patent No. 4,596,812 [1] to Upjohn to reflect a change in inventors. In 1988, Upjohn received approval from the Food and Drug Administration (the "FDA") to sell minoxidil under the brand name "Rogaine." Rogaine continues to be the only FDA-approved topical minoxidil solution on the market.

While awaiting FDA approval for Rogaine, Upjohn learned that defendant Medtron Laboratories, Inc. ("Medtron") and its principles, defendants Anthony Imbriolo ("Imbriolo") and Dominick J. Carlisi ("Carlisi"), were infringing Upjohn's patents by manufacturing and selling their own topical minoxidil product under the brand name "Minoxidil Plus." As a result, on August 10, 1987, Upjohn commenced the current action to enjoin defendants from continued infringement of the patents.

Defendants conceded that Minoxidil Plus infringed Upjohn's patents, but challenged their validity and enforceability. On October 19, 1990, in Upjohn I, the Court rejected defendants' arguments, holding that they failed to rebut the presumption of patent validity. Finding that Upjohn had established the elements necessary to obtain a preliminary injunction, the Court enjoined defendants from "manufacturing, selling or otherwise distributing the infringing product, MINOXIDIL PLUS, during the pendency of [the] litigation." Upjohn I, 751 F.Supp. at 431. Subsequently, on September 1, 1992, in Upjohn II, the Court granted Upjohn's motion for summary judgment on its patent

infringement claim for substantially the same reasons set forth in Upjohn I. By Amended Final Judgment dated November 10, 1992, the Court permanently enjoined defendants "from the continued infringement, including the manufacturing, sale, distribution, advertisement, and promotion, of [Upjohn's patents]." See Amended Final Judgment, annexed to Pl.'s Mem. of Law in Supp. of its Mot. for an Order of Contempt as Exh. "1," at 2.

## II. The Stipulation

In October 1990, shortly after the Court entered the preliminary injunction, Imbriolo called Upjohn sales representative Nora Hennigan ("Hennigan") on behalf of his hair clinic, New York Hair Laboratories ("NYHL"),[2] and notified her that he was interested in purchasing Rogaine. See Affidavit of Nora Hennigan, sworn to on 11/1/90 (the "Hennigan Aff."), annexed to the Declaration of Andrea H. Scheidt, executed on 1/12/93 (the "Scheidt Decl."), as Exh. "B," at ¶¶ 3, 5. Hennigan provided Imbriolo with an account application and Imbriolo immediately placed an order for 118 bottles of Rogaine at a total price of $5,000. Id. at ¶ 6. This order was later cancelled by Upjohn, however, when it learned that the order was not signed by a physician as required by law.[3]

In the meantime, NYHL continued to advertise Minoxidil Plus in local newspapers. One such advertisement stated that NYHL "utilizes the medication Minoxidil and special cleansing agents which increase the effectiveness and results of our hair growth program." See NYHL Advertisement, annexed to the Scheidt Decl. as Exh. "C." Believing that defendants were violating the preliminary injunction by continuing to sell Minoxidil Plus as advertised in the NYHL advertisements, Upjohn hired a private investigator who, on October 18, 1990, purchased a bottle of Minoxidil Plus at NYHL for subse-

---

1. Patent #4,139,619 and patent #4,596,812 shall be referred to collectively as the "patents."

2. In approximately 1990, Medtron ceased operations and Carlisi and Imbriolo began operating their new hair clinic, NYHL. Subsequently, in 1993, NYHL relocated and began operating un-

der the name "Hair & Skin Treatment Center, D.J. Carlisi, M.D., P.C." (the "Hair Center").

3. Hennigan had believed that she was dealing with Carlisi, a licensed physician, when she agreed to open an account for NYHL. See Hennigan Aff. at ¶¶ 2, 3, 5, 7.

quent analysis (the "1990 Sample"). *See* Scheidt Decl. at ¶ 4.

At the same time, Upjohn requested a conference before the Court to discuss defendants' possible violations of the preliminary injunction. At a conference held on October 19, 1990, defendants defended the advertisements on the ground that the preliminary injunction applied to Medtron and Imbriolo but did not cover activities by Carlisi or NYHL. *See* Tr. of 10/19/90 Conference, annexed to the Scheidt Decl. as Exh. "E," at 2–4. At a conference held on November 2, 1990, however, the Court rejected defendants' contention and ruled that the preliminary injunction applied equally to Carlisi and his activities at NYHL. *See* Tr. of 11/2/90 Conference, annexed to the Scheidt Decl. as Exh. "G," at 5–6, 8. As a result of the Court's ruling, defendants entered into a stipulation with Upjohn (the "Stipulation"), in which defendants admitted that they were violating the preliminary injunction by continuing to sell Minoxidil Plus.[4] *See* Stipulation, dated 12/6/90, annexed to the Scheidt Decl. as Exh. "H." In light of defendants' admission, Upjohn filed a contempt motion for defendants' violations of the preliminary injunction.

In the Stipulation, defendants stated that Carlisi intended "to continue to distribute and sell Minoxidil Plus by acquiring a supply of ROGAINE Topical Solution and adding special enhancers and additional minoxidil to make Minoxidil Plus." *Id.* at ¶ 11. Accordingly, in December 1990, NYHL opened an account with Upjohn and ordered 117 bottles of Rogaine. *See* Declaration of Lawrence T. Welch, executed on 1/19/93 (the "Welch Decl."), at ¶ 8; NYHL Account Application, annexed to the Welch Decl. as Exh. "O." After NYHL failed to place any additional orders through the first three months of 1991, however, Upjohn determined that NYHL was continuing to sell its infringing Minoxidil Plus. At a conference held on April 19, 1991, defendants explained that they had stopped placing orders with Upjohn because they were able to buy Rogaine "from

various outlets of Upjohn's." *See* Tr. of 4/19/91 Conference, annexed to the Scheidt Decl. as Exh. "A," at 4. The Court thus ordered defendants to disclose to Upjohn the names of the suppliers as well as the date and amounts of all Rogaine purchases. *Id.* at 5–6.

In compliance with the Court's order, defendants informed Upjohn that the only other source from which defendants purchased Rogaine was Spencer Meade Medical Supply Company ("Spencer Meade"). *See* letter from Lewis H. Eslinger to Thomas L. Creel of 4/29/91, annexed to the Scheidt Decl. as Exh. "K;" letter from Lewis H. Eslinger to Thomas L. Creel of 6/5/91, annexed to the Scheidt Decl. as Exh. "M." Defendants stated further that they purchased a total of 200 bottles from Spencer Meade between November 1990 and April 1991. *See* letter from Lewis H. Eslinger to Thomas L. Creel of 6/5/91, annexed to the Scheidt Decl. as Exh. "M." Additionally, defendants claimed that on May 2, 1991, NYHL bought 100 bottles of Rogaine directly from Upjohn. *See* Welch Decl. at ¶ 9. Defendants explained that only a small quantity of Rogaine was needed to create Minoxidil Plus because they diluted Rogaine from a two percent to a one percent solution to create Minoxidil Plus, and they distributed their product to patients in smaller bottles. *Id.* The result, according to defendants, was that 2.4 bottles of Minoxidil Plus were created from each bottle of Rogaine. *Id.* Based on this explanation and defendants' assurances that Minoxidil Plus was made only from Rogaine and not from any non-Rogaine topical solution, Upjohn withdrew its pending contempt motion.

### III. Upjohn's Investigation

As Upjohn continued to monitor defendants' activities, however, it noted that only 114 bottles were purchased between May 1991 and September 1992. Upjohn thus hired two investigators, Joseph McCabe ("McCabe") and George Hotter ("Hotter"), to visit NYHL and determine whether it was abiding by the Court's injunctions. NYHL

---

4. Thus, under the Stipulation, defendants admitted that the 1990 Sample was an infringement of

Upjohn's patents. *See* Stipulation at ¶¶ 1, 2.

office manager Cleopatra Panagiosoulis ("Panagiosoulis") informed McCabe that Minoxidil Plus is " 'an alcohol and water solution' that 'contains Minoxidil and other penetrating agents,' " but does not contain Rogaine. *See* Declaration of Joseph McCabe, executed on 1/13/93 (the "McCabe Decl."), annexed to the Welch Decl. as Exh. "O," at ¶ 4. On a subsequent visit to NYHL, a physician employed by the company confirmed to McCabe that Minoxidil Plus was not made from Rogaine. *Id.* at ¶ 6. Another NYHL doctor similarly informed Hotter on his visit to the clinic that Minoxidil Plus was not made from Rogaine but rather was a solution composed of minoxidil and other ingredients. *See* Declaration of George Hotter, executed on 1/12/93 (the "Hotter Decl."), annexed to the Welch Decl. as Exh. "O," at ¶ 3. The investigators purchased a total of three bottles of Minoxidil Plus and provided them to Upjohn for analysis (the "1992 Samples"). *See* McCabe Decl. at ¶¶ 2–3; Hotter Decl. at ¶¶ 4–7.

Upjohn research scientist Tore Ramstad ("Ramstad") analyzed the 1992 Samples, compared them to the 1990 Sample acquired in the earlier investigation, and compared all three samples to Rogaine. According to Ramstad, Rogaine is a two percent minoxidil solution containing sixty percent ethyl alcohol, twenty percent propylene glycol and water. *See* Declaration of Tore Ramstad, executed on 1/19/93, annexed to the Welch Decl. as Exh. "O," at ¶ 4. Ramstad determined that the concentration of minoxidil in the 1992 Samples was 1.8 percent and that the concentration in the 1990 Sample was 2.04 percent. *Id.* at ¶¶ 6, 11, 14. He found further that all three contained isopropyl alcohol rather than ethyl alcohol. *Id.* at ¶¶ 7, 12, 15. Based on the consistent absence of ethyl alcohol and the similar minoxidil concentrations, Ramstad concluded that the 1992 Samples were "essentially identical" to the admittedly infringing 1990 Sample, and that none of the samples could have been made from Rogaine. *Id.* at ¶¶ 9, 12, 15. On January 22, 1993, based on this new information, Upjohn reinstituted its contempt motion.

## IV. The Reformulation Defense

In response, defendants asserted that Minoxidil Plus was made directly from Rogaine and that Ramstad's findings support this conclusion. According to defendants, relying on the advice of Henry S. Edelson ("Edelson"), a part-time NYHL physician, NYHL utilized isopropyl alcohol rather than ethyl alcohol in Minoxidil Plus because it penetrates the skin without causing irritation and other side effects. According to defendants, after the injunctions went into effect, NYHL sought to continue to use isopropyl alcohol as a minoxidil carrier in order to continue its safe and effective results.

Imbriolo thus claims that he developed a process of extracting minoxidil from Rogaine and introducing it into his own carrier solution. *See* Declaration of Anthony Imbriolo, executed on 3/2/93, at ¶ 5. Specifically, according to Imbriolo, "I extract minoxidil from Rogaine solution by boiling off the ethyl alcohol carrier solution and water, leaving a residue primarily of pure minoxidil. I then add to the minoxidil residue the carrier solution containing isopropyl alcohol, [lauryl alcohol–4] and glycerine–7." *Id.* at ¶ 6. Edelson confirmed that Imbriolo expressed an interest in reformulating Rogaine into the original carrier solution of Minoxidil Plus, but asserted that Edelson had never performed the reformulation himself. *See* Declaration of Henry S. Edelson, executed on 3/8/93, at ¶ 4. At his deposition, Imbriolo described the reformulation process with greater precision:

I empty the Rogaine into a 2,000 ml beaker to the amount of 1800 mls, then apply heat to reduce the amount, to burn off the amount of alcohol present and most of the water. We used a temperature of about 300 degrees, which reduces it down.... [T]he alcohol burns off at approximately 187 degrees. The water burns off at 220 degrees, which leaves you with propylene glycol and the minoxidil.... Once that has been reduced down, we then add back an isopropyl alcohol and that reduces us down to 720 milliliters. We then add back in the propylene alcohol in order to make the Minoxidil Plus formulation, LA–4 and GL–7, water and color, stir, and it is made.

*See* Deposition of Anthony Imbriolo, taken on 3/10/93, annexed to the Welch Decl. as Exh. "Q," (the "Imbriolo Dep.") at 737. Imbriolo stated further that the resulting product is "a clear solution" of Minoxidil Plus. *Id.* at 747.

Although Imbriolo claimed that he performed the "six to eight-hour" reformulation process approximately every two weeks in the small NYHL office over a period of more than two years, *id.* at 720, 734, 744, no one at NYHL could confirm having seen the process performed during the relevant time period.[5] *See* Deposition of Vincent Piperi, taken on 3/11/93, annexed to the Welch Decl. as Exh. "X," at 120; Deposition of Henry Edelson, annexed to the Welch Decl. as Exh. "P," at 43, 59. During his deposition, Imbriolo was asked whether anyone in the office could have seen him perform the reformulation:

Q. Has anybody ever seen you do the extraction process, actually ever doing it?

A. I don't know.

Q. Do you recall anybody being there?

A. People walk in and out when I am doing it.

Q. So it is possible that Cleo [Panagiosoulis] saw you do the extraction?

A. Possibly.

    \*     \*     \*     \*     \*     \*

Q. Who are the people that could have possibly seen you do the extraction process?

A. Cleo, Margaret, Dr. Edelson, Dr. Piperi. They possibly could have seen me do it.

Q. I understand, but you don't recall any of them actually seeing—

A. No one is standing over my shoulder.

*See* Imbriolo Dep. at 734–35. Later, however, after none of the NYHL employees could recall having seen him perform the process prior to 1993, Imbriolo explained that this was due to the fact that he "conduct[s] this process after business hours, usually on Wednesday nights, beginning at, or sometimes shortly before, 5:00 p.m., and on Satur-

days, so as not to disturb others in the office." *See* Supp.Declaration of Anthony Imbriolo, executed on 4/14/93 (the "Imbriolo Supp.Decl."), at ¶ 3.

## V. Upjohn's Retesting

In light of Imbriolo's detailed description of the process allegedly used by NYHL to create Minoxidil Plus from Rogaine, Upjohn directed Ramstad to determine whether the procedure was scientifically possible. Based on Imbriolo's declaration and deposition testimony, Ramstad attempted to duplicate the reformulation. *See* Declaration of Tore Ramstad, executed on 3/30/93, annexed to the Welch Decl. as Exh. "T," at ¶¶ 2, 7. Ramstad was unable to duplicate the results because (1) boiling off the solution to 720 milliliters and bringing it back to its original volume results in a solution containing six percent ethyl alcohol as opposed to the "traces" of ethyl alcohol found in Minoxidil Plus; (2) the resulting solution was "a strong yellow color" rather than "clear" as described by Imbriolo; and (3) maintaining a constant temperature of 300 degrees Fahrenheit is scientifically impossible due to certain chemical principles. *Id.* at ¶ 7.

## VI. NYHL's Alleged Rogaine Source

Based on its belief that defendants were not in compliance with the injunctions, Upjohn began to investigate NYHL's alleged Rogaine sources. In response to Upjohn's inquiries, defendants asserted that, after the preliminary injunction took effect in October 1990, Imbriolo assumed the responsibility for procuring Rogaine. *See* Imbriolo Dep. at 706–07. At his deposition, Imbriolo stated that Jerry Greenberg ("Greenberg"), on behalf of Paramount Medical Supplies ("Paramount Medical"), would personally deliver Rogaine to him at NYHL. *See* Imbriolo Dep. at 713. According to Panagiosoulis, NYHL's office manager, Greenberg regularly delivered packages to Imbriolo, but she could not identify the contents because they were delivered behind Imbriolo's closed office door. *See* Panagiosoulis Dep. at 107. In

---

5. One employee, Panagiosoulis, stated that she saw the reformulation process performed in February 1993. *See* Deposition of Cleopatra Pana-

giosoulis, taken on 1/20/93, annexed to the Welch Decl. as Exh. "V," at 141–42.

response to Upjohn's inquiries, defendants admitted that they could not locate Greenberg's business card, address or telephone number. *See* letter from Lewis H. Eslinger to Richard S. Gresalfi of 3/15/93, annexed to the Welch Decl. as Exh. "W." Imbriolo also admitted that he did not deduct the cost of Rogaine as a business expense, as his accountant completed his tax returns and he did not provide the accountant with this information. *See* Imbriolo Dep. at 694–97.

At his deposition, Imbriolo claimed that there were no records of his transactions with Paramount Medical because they constituted a "standing order" and payment was always made in cash. *Id.* at 720–23. Subsequently, however, Imbriolo provided Upjohn with sixteen invoices reflecting the sale of Rogaine between May 1992 and February 1993 (the "Invoices"). *See* Invoices, annexed to the Welch Decl. as Exh. "AA." Each Invoice indicates the sale of 1200 milliliters of Rogaine to Carlisi from Paramount Medical in the amount of $2,675, C.O.D., and sent via "U.P.S." *Id.* When Upjohn attempted to subpoena Paramount Medical to confirm this information, however, it learned that the company went out of business in 1989. *See* Affidavit of Attempted Service of Gordon Edelman, sworn to on 2/18/93, annexed to the Welch Decl. as Exh. "DD;" *see also* Affidavit of Joshua R. Bressler, annexed to the Welch Decl. as Exh. "GG," at ¶ 6 (noting that an attempted verification with the telephone company revealed that Paramount Medical's phone was disconnected in May 1989). Moreover, an inquiry at United Parcel Service revealed that it had made no deliveries from Paramount Medical to defendants as indicated on the invoices. *See* letter from Frank Cangemi to Richard S. Gresalfi of 2/25/93, annexed to the Welch Decl. as Exh. "Z."

## VII. Independent Testing

On March 17, 1994, Magistrate Judge Grubin held an evidentiary hearing on the contempt motion (the "Hearing").[6] At the Hearing, Imbriolo testified that all of the Minoxi-

dil Plus dispensed since the October 1990 injunction was derived directly from Rogaine. Tr. at 8–9. He testified further that he still produces Minoxidil Plus using his reformulation process, but that he performs the process only every four to eight weeks. *Id.* at 13.

To evaluate the veracity of Imbriolo's claim, the Magistrate Judge directed him to perform the reformulation process during the Hearing. *Id.* at 43. The Magistrate Judge also ordered Imbriolo to have six bottles of Minoxidil Plus delivered from the Hair Center (the "Hair Center Sample"). *Id.* at 108. The Magistrate Judge then ordered the parties to hire an independent laboratory to compare the Hair Center Sample to the solution produced in court (the "In–Court Sample"). *Id.* at 120. Shortly thereafter, the samples were sent to United States Testing Company, Inc. ("USTC") for examination.

On August 12, 1994, USTC issued a report setting forth its findings. USTC concluded that, while it detected 2.51 percent of ethyl alcohol in the In–Court Sample, it did not detect any ethyl alcohol in the Hair Center Sample. *See* USTC Report dated 8/12/94. Additionally, USTC reported that the In–Court Sample contained 27.55 percent of isopropyl alcohol whereas the Hair Clinic Sample contained 47.30 percent of isopropyl alcohol. *Id.* According to Upjohn, these results establish conclusively that Imbriolo has not been manufacturing Minoxidil Plus using the method he demonstrated during the Hearing. According to defendants, however, the USTC analysis proves only that Imbriolo is "nothing more than ... a bucket chemist who formulates minoxidil plus in a hit and miss fashion," and therefore cannot be expected to produce the same product in each reformulation. *See* letter from Lewis H. Eslinger to the Hon. Sharon E. Grubin of 9/22/94.

Subsequently, in support of its contempt motion, Upjohn submitted to the Court a copy of a facsimile communication dated January 4, 1995, sent from a company named Franceschi located in Ghezzano, Italy (the "Facsimile"). The Facsimile was sent to the

---

**6.** By Order dated April 7, 1993, the Court referred Upjohn's contempt motion to Magistrate Judge Grubin for Report and Recommendation.

The reference was withdrawn, however, prior to a final determination by the Magistrate Judge.

"Hair & Skin Treatment Center," to the attention of "Mr. Antony Imbriolo." *See* Facsimile, annexed to the letter from Richard S. Gresalfi to the Hon. Sharon E. Grubin of 1/11/95. The Facsimile indicates that it is responding to Imbriolo's request for a price of a quantity of minoxidil powder. *Id.* It states further that the "[s]ales conditions" will be "the same of [sic] the last time." *Id.* This evidence, according to Upjohn, establishes that Imbriolo is continuing to violate the Court's preliminary and permanent injunctions by purchasing minoxidil powder from other sources in order to manufacture Minoxidil Plus. The Court shall address Upjohn's motion below.[7]

## DISCUSSION

### I. Contempt

Civil contempt is designed to coerce a reluctant party to obey a court's directive. *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). Because a contempt order is a severe sanction, it is subject to a higher standard of proof than the "preponderance of the evidence" standard applicable to other civil cases. *Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.*, 341 F.2d 101, 102 (2d Cir.1965); *King v. Allied Vision*, 155 F.R.D. 440, 448 (S.D.N.Y.1994). The burden of proof is thus a "clear and convincing" standard. *New York State Nat'l Org. For Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *see also International Controls & Measurements Corp. v. Watsco, Inc.*, 853 F.Supp. 585, 587 (N.D.N.Y. 1994) (noting that the "clear and convincing evidence" standard lies at an intermediate point between the "preponderance of the evidence" and "beyond a reasonable doubt" standards). Pursuant to the "clear and convincing" evidence standard, a court's inherent power to hold a party in civil contempt should be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous; (2) the proof of non-

compliance is clear and convincing; and (3) the party has not diligently attempted in a reasonable manner to comply. *United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 44 F.3d 1091, 1096 (2d Cir.1995); *United States v. O'Rourke*, 943 F.2d 180, 189 (2d Cir.1991); *New York State Nat'l Org. For Women v. Terry*, 886 F.2d at 1351.

In the present case, the Court finds that Upjohn has established by clear and convincing evidence that Imbriolo has failed to comply with the Court's preliminary and permanent injunctions. First, the Court finds that both injunctions were clear and unambiguous. Specifically, the preliminary injunction expressly enjoined defendants from "manufacturing, selling or otherwise distributing the infringing product, MINOXIDIL PLUS, during the pendency of [the] litigation." *Upjohn I,* 751 F.Supp. at 431. Similarly, the permanent injunction prevented defendants "from the continued infringement, including the manufacturing, sale, distribution, advertisement, and promotion, of [Upjohn's patents]." *See* Amended Final Judgment at 2. Accordingly, the first prong necessary for finding contempt has been established.

Second, Upjohn has presented clear and convincing evidence that Imbriolo has continued to infringe Upjohn's patents in disregard of the Court's orders. In fact, the weight of all of the evidence belies Imbriolo's claim that he produces Minoxidil Plus through a process of boiling off the ethyl alcohol contained in Rogaine and replacing it with isopropyl alcohol and special enhancers. Upjohn's chemists were unable to duplicate the reformulation process as described in detail by Imbriolo in his declaration and deposition testimony. Rather, they determined that Minoxidil Plus could not have been derived from Rogaine because it would have contained significantly more than the "traces" of ethyl alcohol found in the Minoxidil Plus bottles allegedly produced by Imbriolo's reformulation process. *See* Second Decl. of Tore Ramstad, at ¶ 7.

---

7. Although Upjohn's motion originally sought a civil contempt order against all defendants, Medtron has since gone out of business and Carlisi has died. Accordingly, the Court shall treat Upjohn's motion as directed against Imbriolo, the only remaining defendant.

Most significantly, Imbriolo was unable to create a similar Minoxidil Plus product when he performed the reformulation process in court. Despite following his own recipe, the solution created in court was dissimilar from the product delivered from the Hair Center on the same day. Specifically, an independent testing laboratory, USTC, found that, while the In–Court Sample contained 2.51 percent of ethyl alcohol, the Hair Center Sample contained no detectable quantity of ethyl alcohol. These findings support Ramstad's conclusion that Minoxidil Plus could not have been made from Rogaine because the ethyl alcohol cannot be burned off as Imbriolo described.

Moreover, the Court finds it incredible that none of Imbriolo's employees could recall having seen him perform even a portion of his six to eight-hour reformulation process.[8] This is particularly telling in light of Imbriolo's claim that he reformulated Rogaine every two weeks in the small NYHL office over a period of several years. Imbriolo's excuse, namely that he "conduct[s] this process after business hours, usually on Wednesday nights, beginning at, or sometimes shortly before, 5:00 p.m., and on Saturdays, so as not to disturb others in the office," see Imbriolo Supp.Decl., at ¶ 3, is contradicted by his own prior deposition in which he indicated that "[p]eople walk in and out" of the office during the process and therefore others could "possibly" have seen him performing the reformulation. See Imbriolo Dep. at 734–35.

Other evidence further establishes that Imbriolo is in contempt of this Court's orders. In particular, Ramstad's analysis of the 1990 and 1992 Samples yielded the same conclusion that Minoxidil Plus was not derived from Rogaine.[9] Again, Ramstad concluded, and the Court is convinced, that the absence of ethyl alcohol in Minoxidil Plus renders it scientifically impossible that it was created from Rogaine. Moreover, the Court's conclusion is supported by statements made by NYHL employees to Upjohn investigators that Minoxidil Plus is not made from Rogaine.

The Court also finds significant Imbriolo's inability to produce credible documentation to support his claim that he purchases Rogaine from Upjohn distributors. Although Imbriolo contends that he receives a regular delivery of Rogaine from an individual named Greenberg at Paramount Medical, no one could confirm the contents of the deliveries. Despite an extensive search, Upjohn was unable to locate Greenberg, and even Imbriolo was unable to produce an accurate address or telephone number for Greenberg or Paramount Medical. Further, Imbriolo claims that he does not keep written records of his transactions with Paramount Medical despite the fact that he allegedly paid the company over $5,000 each month in cash for his Rogaine supply. Astonishingly, Imbriolo does not take a business deduction on his tax returns for this enormous annual expenditure.

As for the Invoices produced by Imbriolo purporting to pertain to certain purchases of Rogaine from Paramount Medical, the Court is dubious of their veracity. Significantly, it appears that Paramount Medical went out of business in 1989 and yet the Invoices cover a time period from May 1992 to February 1993. The Invoices all indicate that they were sent via the United Parcel Service despite Imbriolo's claim that Greenberg personally delivered every Rogaine order. Further, United Parcel Service claims that no such deliveries were made. Additionally, the Court takes note of the fact that Imbriolo produced these Invoices despite his consis-

---

**8.** Although Panagiosoulis stated that she saw the reformulation process performed in February 1993, shortly after Imbriolo first described the reformulation process to Upjohn, the Court finds that this incident is scant evidence that Imbriolo had been performing the process regularly over an extended time period.

**9.** The Court rejects defendants' contention that Ramstad's analysis should be rejected on the ground that Upjohn has not established chain of custody. The Court notes that, although Upjohn made all chain of custody witnesses available for testimony, defendants chose to forego any depositions in lieu of Upjohn's assurances that the samples were properly maintained and transported to Ramstad for examination. See letters from Richard S. Gresalfi to Lewis S. Eslinger of 1/25/93 and 1/29/93 and letter from Lewis S. Eslinger to Richard S. Gresalfi of 1/28/93, annexed to Pl.'s Reply Mem. of Law as Exh. "R."

tent assertions that he did not maintain accurate written records of his Rogaine purchases.

Finally, Imbriolo has not even attempted to provide an explanation for the Facsimile, a communication that clearly indicates that Imbriolo has sent multiple, recent requests to an overseas corporation to purchase minoxidil powder. This intended purchase is undoubtedly necessary for the Hair Center's production of Minoxidil Plus. Based on all of the foregoing, the Court finds that Upjohn has demonstrated by clear and convincing evidence that Imbriolo is not in compliance with the injunctions.

Third, the Court finds that Imbriolo has made no reasonable attempt to comply with the injunctions. Rather, the Court finds that Imbriolo willfully has sought to evade the Court's authority through an illusive trail of feigned ignorance, faulty recordkeeping, questionable documentation and hidden overseas purchases. Accordingly, as Upjohn has met its burden of proving all three prongs of the test for civil contempt, the Court finds Imbriolo in contempt of the preliminary and permanent injunctions previously issued by this Court.

## II. Sanctions

■ Having found Imbriolo in contempt, the Court next must determine an appropriate remedy. The purpose of civil contempt proceedings is remedial and compensatory rather than punitive. *Sunbeam Corp. v. Golden Rule Appliance Co.,* 252 F.2d 467, 469 (2d Cir.1958); *see also Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d Cir.1995) (stating that a civil contempt order is coercive rather than punitive in nature); *Benjamin v. Malcolm,* 156 F.R.D. 561, 566 (S.D.N.Y.1994) (" 'Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damage sustained by reason of noncompliance' ") (quoting *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949)). Thus, sanctions should be calculated to coerce future compliance with the court's orders and to compensate the injured party for losses resulting from the contemptuous

conduct. *Cancer Research Inst., Inc. v. Cancer Research Soc'y, Inc.,* 744 F.Supp. 526, 529 (S.D.N.Y.1990). Where the purpose of a contempt remedy is coercive, the court has broad discretion to fashion a remedy that will bring a defendant into compliance. *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 673 F.2d 53, 57 (2d Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

■ Sanctions for civil contempt can be imposed without a finding of willfulness. *Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd.,* 885 F.2d 1, 5 (2d Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990); *Canterbury Belts, Ltd. v. Lane Walker Rudkin, Ltd.,* 869 F.2d 34, 39 (2d Cir.1989). The Court may, however, consider a contemnor's intent in determining an appropriate sanction. *Canterbury Belts, Ltd. v. Lane Walker Rudkin, Ltd.,* 869 F.2d at 39.

■ In the case at hand, a sanction must be applied both to compensate Upjohn for losses incurred as a result of the contemptuous conduct and to coerce future compliance. With respect to compensation for Upjohn's losses, Upjohn claims that there is direct evidence of actual damages as a result of Imbriolo's contempt. *See* Pl.'s Reply Mem. in Supp. of Pl.'s Mot. for an Order of Contempt, at 29. Actual damages will be assessed by calculating Upjohn's total lost profits beginning in October 1990. Specifically, the monetary sanction will be determined by multiplying (1) the number of Rogaine bottles that would have been purchased during the relevant time period less the number of bottles actually purchased by (2) Upjohn's profit per bottle for its sale of Rogaine. As the Court is unable to compute this amount based on the documentation already submitted, the precise monetary sanction shall be determined upon submission of all relevant evidence.

As previously discussed, however, the remedy should be designed not only to compensate Upjohn for several years of violations of the injunctions, but also to bring Imbriolo into compliance. In light of Imbriolo's continued disregard for the Court's orders, the Court shall order that (1) the current inventory of Minoxidil Plus be seized; (2) written

records be kept of all future dispensing of minoxidil products, including the dispensing date, the contents of the solution and the quantity of Rogaine contained in the product; and (3) all future purchases of Rogaine be made directly from Upjohn rather than from distributors or other third parties.

With respect to Upjohn's claim for attorneys' fees, it is well-settled that the costs of prosecuting a party's contempt are recoverable where the violation of the court order has been "willful." *Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd.*, 885 F.2d at 8; *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130–131 (2d Cir.1979) (citing *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664–65 & n. 5 (2d Cir.1970)); *Wella Corp. v. Wella Graphics, Inc.*, 874 F.Supp. 54, 56 (E.D.N.Y.1994). As the Court has found the contemptuous conduct to be willful, Upjohn is entitled to reasonable attorneys' fees for pursuing this action.

## CONCLUSION

For the aforementioned reasons, Upjohn's motion for an order of contempt is granted. Accordingly, it is hereby

ORDERED that, by August 1, 1995, Upjohn shall provide the Court with (1) documentation relevant to a determination of its lost profits in terms of foregone sales to defendants beginning in October 1990; and (2) detailed time records setting forth the legal fees incurred in pursuing its contempt motion. It is further

ORDERED that Imbriolo may submit any documentation relevant to these issues by August 15, 1995. It is further

ORDERED that Imbriolo maintain written records of all future dispensing of minoxidil products, including the dispensing date, the chemical contents of the solution dispensed and the quantity of Rogaine contained in the product. It is further

ORDERED that defendants' future purchases of Rogaine be made directly from Upjohn rather than from distributors or other third parties. It is further

ORDERED that Upjohn is authorized under the supervision and with the assistance of the United States Marshal, to take all necessary steps to secure and remove all inventory of Minoxidil Plus at the Hair & Skin Treatment Center, D.J. Carlisi, M.D., P.C. located at 3 East 80th Street, New York, New York, including breaking open, entering and searching for said property and delivering it to the Court. It is further

ORDERED that anyone interfering with the execution of this Order is subject to arrest by the United States Marshal and/or his or her representative. It is further

ORDERED that Upjohn, on whose behalf the court issues this Order, will account completely for all property seized pursuant to this Order and shall compile a written inventory of all such property and shall provide a copy to the United States Marshal, who shall include such copy with his delivery to the court. It is further

ORDERED that Upjohn, on whose behalf the court issues this Order, shall hold harmless the United States Marshals Service and its employees from any and all claims, asserted in any court or tribunal, arising from any acts, incidents, or occurrences in connection with the seizure and possession of the defendant property, including any third-party claims.

SO ORDERED.