CHERE AMIE, INC., Obvious, Inc. and Greena, Inc., Plaintiffs,

v.

WINDSTAR APPAREL, CORP., Global Apparel, Inc, Jong Kee Park, Jae C. Han, Paula B. Abraham, Barbara Rentzer, Mia Decaro, Young Hwa Yoo and Kohl's Department Stores. Defendants.

No. 01–Civ.0040(WHP).

United States District Court, S.D. New York.

May 3, 2001.

James P. Cinque, Cinque & Cinque, New York, New York, Plaintiff.

Paul W. Siegert, Jung & Siegert, New York, New York, for Windstar Defendants.

Norman A. Zivin, Cooper & Dunham LLP, New York, New York, for Defendant Kohl's.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

Plaintiffs Chere Amie, Inc., Obvious, Inc. and Greena, Inc. (collectively "Chere Amie") seek a finding of contempt and damages against defendants Windstar Apparel, Corp., Global Apparel, Inc., Jong Kee Park, Jae C. Han, Paula B. Abraham, Barbara Rentzer, Mia Decaro and Young Hwa Yoo (collectively "Windstar")[1] for violating this Court's February 28, 2001 Memorandum and Order directing a recall of all goods infringing on Obvious, Inc.'s trademark "Girl Zone" and five of its copyrighted sleepwear designs ("Sleepwear Designs"). For the reasons stated below, Chere Amie's application is granted.

## BACKGROUND

### I. Prior Proceedings

The facts underlying this action have been set forth in greater detail in this Court's February 28, 2001 Memorandum and Order, familiarity with which is assumed. *Chere Amie, Inc. v. Windstar Apparel, Inc.*, No 01 Civ. 0040(WHP), 2001 WL 210364 (S.D.N.Y. Feb. 28, 2001).

Chere Amie moved by order to show cause on January 3, 2001 for, *inter alia,* a temporary restraining order and a preliminary injunction enjoining defendants from selling or distributing sleepwear infringing on the "Girl Zone" trademark and the Sleepwear Designs. On February 28, 2001, this Court found that plaintiffs demonstrated a likelihood of success on the

---

**1.** Defendant Kohl's Department Stores ("Kohl's") was not added as a defendant to this action until April 11, 2001 and is not a subject of Chere Amie's contempt allegations.

merits and issued a preliminary injunction enjoining the defendants from directly or indirectly using the "Girl Zone" trademark and the Sleepwear Designs. This Court also granted plaintiffs' applications for an order directing Windstar to "[r]ecall from all distributors, wholesalers, jobbers, dealers, and retailers and deliver to Obvious, Inc. any originals, copies, facsimiles, or duplicates of any products employing the 'Girl Zone' trademark and [the Sleepwear Designs]," and to "[a]ccount for and hold in a constructive trust all gains and profits derived from sales of any products employing the 'Girl Zone' trademark or [the Sleepwear Designs]."

Shortly after the preliminary injunction issued, Chere Amie and Windstar retained new counsel. On March 11, 2001, Windstar's new counsel contacted the former counsel for Chere Amie regarding, *inter alia,* the findings of fact made in this Court's preliminary injunction order. (Pls.' Ex. 1: Siegert Letter dated Mar. 11, 2001.) Two days later, he contacted Chere Amie's former counsel again to advise that Windstar had been "informed of its obligations" under this Court's February 28, 2001 Memorandum and Order. (Pls.' Ex. 2: Siegert Letter dated Mar. 13, 2001.)

Between March 10 and 25, 2001, Chere Amie representatives visited Kohl's stores in Secaucus, New Jersey; Lone Tree, Colorado; Louisville, Kentucky; Powell, Ohio; and Marietta, Georgia and purchased Windstar products bearing the "Girl Zone" trademark. (Contempt Hearing Transcript ("Tr."), dated Apr. 13, 2001 at 12; Decl. of Chang W. Lee in Supp. of Applications for Contempt, dated Mar. 27, 2001 ¶ 2; Decl. of Eve Lee Rocco in Supp. of Contempt Application, dated Mar. 28, 2001 ¶¶ 2, 3, 5; Decl. of Myo Kim in Supp. of Contempt Application, dated Mar. 28, 2001 ¶¶ 2–3; Decl. of Stephen Demeter in Supp. of Contempt Application, dated Mar. 28,

2001 ¶¶ 2, 4; Decl. of Susan Martin in Supp. of Contempt Application, dated Mar. 28, 2001 ¶¶ 2–3; Decl. of Tiffany Aubrey in Supp. of Contempt Application, dated Mar. 28, 2001 ¶¶ 2–3). Thereafter, Chere Amie moved by order to show cause on March 30, 2001 for a finding of contempt against Windstar.

After the submission of opposition and reply papers, this Court conducted an evidentiary hearing on April 10, 2001. At the start of the hearing, Windstar conceded that sales of infringing "Girl Zone" merchandise were made as recently as April 8, 2000. (*See* Apr. 10, 2001 Tr. at 3.) Windstar called two witnesses: Jong Kee Park ("Park"), the president of Windstar Apparel Inc., and Paula Abraham, Windstar's sales manager, neither of whom were credible. Both Park and Abraham testified that Windstar's efforts to enforce this Court's injunction began on March 14, 2001 when Park telephoned Kohl's concerning the recall. (Apr. 13, 2001 Tr. at 11, 14.) In the earlier hearing for the preliminary injunction, this Court declined to credit Park's testimony concerning a central issue in the case, the validity of a licensing agreement for the "Girl Zone" trademark. Specifically, this Court found Park's purported license to be a "sham," and the suspect circumstances surrounding its creation to be shrouded with the "spectre of fraud." *Chere Amie,* 2001 WL 210364, at *4.

During the contempt hearing, Abraham testified that she personally inspected four different Kohl's stores on Long Island on April 7, 2001 looking for any "Girl Zone" Sleepwear. (Apr. 13 Tr. at 50.) She claimed that none of Windstar's "Girl Zone" merchandise was available for sale at those stores. Abraham's testimony was squarely impeached by a Chere Amie representative who visited Kohl's Bay Shore and Oceanside stores on April 13, 2001,

where she observed racks of Windstar's "Girl Zone" merchandise for sale and purchased "Girl Zone" Sleepwear at discounted prices. (*See* Apr. 10, 2001 Tr. at 3; Apr. 23, 2001 Tr. at 7, 11, 13; Pl.'s Exs. 4, 5, 6: Girl Zone Sleepwear.) This Court received into evidence the sales receipts and "Girl Zone" pajamas purchased by Chere Amie's representative on April 13, 2001 at Kohl's stores located in Oceanside, Bay Shore, and Deer Park, Long Island. Windstar did not offer any evidence other than the testimony of its two incredible witnesses to support their representations.

## DISCUSSION

### I. Contempt

#### A. Standards for Contempt

■ Civil contempt is designed to coerce a reluctant party to obey a court's directive. *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir.1986). Because a contempt order is a severe sanction, it is subject to the higher "clear and convincing" evidence standard rather than the usual preponderance of the evidence standard applicable to other civil cases. *New York State Nat'l Org. For Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir.1989); *Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.*, 341 F.2d 101, 102 (2d Cir.1965); *Bear U.S.A., Inc. v. Kim*, 71 F.Supp.2d 237, 246 (S.D.N.Y.1999); *King v. Allied Vision*, 155 F.R.D. 440, 448 (S.D.N.Y.1994). Thus, a court should only exercise its inherent power to hold a party in civil contempt when the order the party allegedly failed to comply with is clear and unambiguous, the proof of noncompliance is clear and convincing, and the party has not diligently attempted in a reasonable manner to comply. *United States v. Local 1804-1, Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1096 (2d Cir.1995); *King*, 65 F.3d at 1058; *New York State Nat'l Org. For Women,*

886 F.2d at 1351; *A.V. by Versace v. Gianni Versace, S.p.A.,* 87 F.Supp.2d 281, 288; *Jeri–Jo Knitwear, Inc. v. Club Italia, Inc.,* 94 F.Supp.2d 457, 458 (S.D.N.Y.2000); *The Upjohn Co. v. Medtron Labs., Inc.,* 894 F.Supp. 126, 133 (S.D.N.Y.1995); *see also* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:22, at 43 (4th ed. 1999) ("Diligent compliance with the terms of an injunction is needed to avoid contempt. More is required than a grudging, half-hearted or foot dragging attempt at compliance.")

#### B. Application of Contempt Standards

■ Chere Amie has established by clear and convincing evidence that Windstar failed to comply with this Court's preliminary injunction. This Court's February 28, 2001 Memorandum and Order clearly and unambiguously directed Windstar to recall its "Girl Zone" products. *Bear, U.S.A.,* 71 F.Supp.2d at 246; *New York State Nat'l Org. For Women,* 886 F.2d at 1353. Windstar demonstrated its appreciation for the obligations of the recall when it sought modification of the preliminary injunction in order to alleviate "[t]he cost for removing this large number of units, storing them temporarily at Kohl's and then re-packing and shipping them to Obvious...." (*See* Letter of Paul W. Siegert, dated Mar. 19, 2001, at 2.)

Further, the unabated sales of infringing "Girl Zone" products throughout March and into April clearly and convincingly demonstrate Windstar's failure to carry out the recall. Windstar concedes that its efforts to recall the infringing products did not begin until at least two weeks after this Court issued its preliminary injunction, and that as of April 13, 2001, it still had no idea if or how Kohl's was proceeding with the recall. (Apr. 13, 2001 Tr. at 85.)

Windstar argues that the recall was delayed for two weeks because its former counsel withheld this Court's Memorandum and Order from its substituted counsel. On February 28, 2001, this Court notified Windstar's former counsel by telephone that a Memorandum and Order had been issued and was available. After counsel failed to pick up a copy of the Memorandum and Order from chambers, a copy was mailed on March 1, 2001. Windstar further argues that several days of delay resulted because Chere Amie's counsel failed to fax a copy to Windstar as he promised. (Apr. 13, 2001 Tr. at 63.) However, at no time did Windstar's new counsel request a copy of this Court's order from chambers or from the Clerk of the Court. (Apr. 13, 2001 Tr. at 63.) Further, by its own admissions, Windstar had actual notice of the preliminary injunction by March 11, 2001. (Pls.' Ex. 1: Siegert Letter dated Mar. 11, 2001, at 2.)

Moreover, Windstar may not rely on a "studied ignorance" of the terms of the order to postpone compliance or preclude a finding of contempt. *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 646 F.2d 800, 807 (2d Cir.1981). Windstar and its counsel "have a duty to monitor the progress of the litigation and to ascertain the terms of any order entered against the party. Unexcused failure to do so may justify a finding of contempt when the party knows that some order has been entered against him." *Perfect Fit,* 646 F.2d at 808.

Windstar also maintains that any delay in enforcing the recall resulted from either the logistical burden of retrieving nearly 200,000 items of clothing from 500 stores across the United States or from Kohl's refusal to abide by Windstar's instructions for a recall.

Windstar's attempt to shift the blame for continuing sales of infringing products is belied by the utter lack of evidence that any steps had been taken to implement a recall. By its own admissions, Windstar unilaterally fashioned recall procedures, such as requiring Kohl's to package each infringing item by style and size (Apr. 13, 2001 Tr. at 36, 39), which thwarted the recall and served no purpose other than Windstar's financial interest. Moreover, Windstar offered no documentary evidence demonstrating when it notified Kohl's of the preliminary injunction or what steps it took to carry out the recall. The only evidence of a recall was Abraham's self-serving hearsay assertion that seventy percent of the recall had been completed (Apr. 13, 2001 Tr. at 39) and her demonstrably false assertion that all of Windstar's "Girl Zone" products had been pulled from at least four locations which she personally inspected in Long Island, New York. (Apr. 13, 2001 Tr. at 50). Neither statement is entitled to any weight.

Accordingly, this Court finds Windstar in contempt of the February 28, 2001 Memorandum and Order directing it to recall and deliver to plaintiffs all its products infringing on the "Girl Zone" trademark and Sleepwear Designs.

## II. *Sanctions*

### A. *Standards for Contempt Sanctions*

The purpose of civil contempt proceedings is coercive and compensatory rather than punitive. *See Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d Cir.1995) (stating that a civil contempt order is coercive rather than punitive in nature); *Benjamin v. Malcolm,* 156 F.R.D. 561, 566 (S.D.N.Y.1994) (" 'Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damage sustained by reason of noncompliance' ") (quoting *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497,

499, 93 L.Ed. 599 (1949)). Thus, sanctions should be calculated to coerce future compliance with the court's orders and to compensate the injured party for losses resulting from the contemptuous conduct. *A.V. by Versace,* 87 F.Supp.2d at 289; *Bear U.S.A.,* 71 F.Supp.2d at 248–49; *Cancer Research Inst., Inc. v. Cancer Research Soc'y, Inc.,* 744 F.Supp. 526, 529 (S.D.N.Y. 1990). Since the purpose of a contempt remedy is coercive, this Court has broad discretion to fashion a remedy that will bring a defendant into compliance. *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 673 F.2d 53, 57 (2d Cir.1982).

■ Sanctions for civil contempt can be imposed without a finding of willfulness. *Manhattan Indus., Inc. v. Sweater Bee By Banff, Ltd.,* 885 F.2d 1, 5 (2d Cir.1989); *Canterbury Belts, Ltd. v. Lane Walker Rudkin, Ltd.,* 869 F.2d 34, 39 (2d Cir. 1989); *The Upjohn Co.,* 894 F.Supp. at 135. The Court may, however, consider whether a contemnor acted willfully in determining an appropriate sanction. *Canterbury Belts,* 869 F.2d at 39; *The Upjohn Co.,* 894 F.Supp. at 135.

### B. *Fines*

■ Chere Amie requests that this Court impose fines for Windstar's violations of the preliminary injunction. (Apr. 13, 2001 Tr. at 25.) Civil contempt fines may be awarded to force a contemnor to conform its conduct to a court's order and to compensate a victim's injury for the loss or harm caused by the unlawful conduct. *Perfect Fit,* 646 F.2d at 807.

This Court finds that a coercive fine is appropriate here. Accordingly, Windstar is directed to pay the Clerk of the Court a fine of $25,000 by the close of business on

May 6, 2001. In addition, a fine of $10,000 payable to the Clerk of the Court will be imposed for each day beginning on May 5, 2001 that Windstar fails to carry out a recall of the infringing goods in accord with this Court's February 28, 2001 order. To the extent that Chere Amie is entitled to compensatory damages, they can be determined at trial. This Court anticipates that trial of the underlying action will occur within several months.

### C. *Attorneys' Fees*

Chere Amie also requests that it be awarded the costs of prosecuting the contempt motion, including reasonable attorney's fees. Such an award is appropriate only where the "contemnor had actual notice of the Court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." *Bear U.S.A. v. Kim,* 71 F.Supp.2d 237, 249 (S.D.N.Y.1999). This Court finds that Windstar's contempt was willful.

Although Windstar twice requested a "revision" of the Memorandum and Order allowing the recalled products to be returned to Windstar instead of Obvious, Inc.[2] (*see* Letter from Paul W. Siegert, Esq., dated Mar. 19, 2001 at 2; Defs.' Aff. in Opp. to Pls.' Mot. for Contempt ¶ 13), Windstar's request to change the shipping destination did not relieve it from the obligation to recall the infringing "Girl Zone" products from Kohl's stores. Windstar had constructive notice of its preliminary injunction on February 28, 2001 and actual notice by March 11, 2001 at the latest, but conducted a cost benefit analysis and permitted the sale of infringing products to continue.

---

**2.** This Court denied Windstar's request because Windstar improperly raised it merely as

an "afterthought." (Apr. 10, 2001 Tr. at 2.)

Having found willful contempt, this Court "would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs for the victim of contempt." *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir.1996). No such grounds are present here. Accordingly, this Court finds that Chere Amie is entitled to an award of attorneys' fees for the prosecution of this contempt application. This Court will determine the amount of attorney fees upon a fully submitted motion to be made after trial of the underlying action.

### D. *Treble Damages*

Chere Amie asks that its award of profits be trebled pursuant to 15 U.S.C. § 1117(a) in light of the willful nature of the contempt. Treble damages may be imposed as a means of coercing compliance with a court order. *Bear U.S.A., Inc.*, 71 F.Supp.2d at 249; *see also N.A. Sales Co., Inc. v. Chapman Indus. Corp.*, 736 F.2d 854, 857–58 (2d Cir.1984). This Court declines to award treble damages at this time. Chere Amie may renew its application for treble damages at trial.

### CONCLUSION

Chere Amie's application for a finding of contempt is granted. Windstar is again directed to recall and deliver to Chere Amie all products infringing on the Girl Zone trademark and the Sleepwear Designs referenced in this Court's February 28, 2001 Memorandum and Order. The Windstar defendants are directed to pay a fine of $25,000 to the Clerk of the Court by the close of business on May 7, 2001, and will be fined $10,000 jointly and severally for each day they fail to carry out the recall beginning on May 5, 2001. This Court further finds that Chere Amie is entitled a fine to recompense any injury resulting from Chere Amie's contempt and attorneys' fees for the prosecution of this contempt application. The amounts of these awards are to be determined after trial of this action. Chere Amie's application for treble damages is denied.

Windstar is further ordered to deposit in escrow by the close of business May 7, 2001, all net profits derived from sales employing the "Girl Zone" trademark or the Sleepwear Designs. Net profits are calculated by $3,912,327.12, Windstar's gross revenue from infringing products (*See* Letter from Paul W. Siegert, dated Mar. 19, 2001, at 1), less any attributable costs. If the parties cannot stipulate to the amount of attributable costs, Windstar shall submit documentation supporting its claim for attributable costs to this Court by May 8, 2001, and Chere Amie shall submit its opposition by May 9, 2001. A pretrial conference is scheduled for May 14, 2001 at 4:00 p.m.