**BEAR U.S.A., INC., Plaintiffs,**

v.

**William KIM, Dura–Tex, Inc., Theodore Held, Sheldon Held, Best Values Styles, Inc., Inner City Jeans & Sportswear, Ltd., A.J. Sheepskin & Leather Outerwear, Inc., B.J. Myerson, Inc., Family Off Price Shop, Inc., Ill Joo Lee, Bear Mountain, Inc., Suk J. Kong, Midwest International Trading, and Show Tree, Inc., Defendants.**

**Bear U.S.A., Inc., Plaintiffs,**

v.

**Bing Chuan Group U.S.A. Corp., William Kim, John Doe d/b/a Just for You, Momo St. Nicholas, Inc. d/b/a New York Sports, and John Doe d/b/a Headquarters, Defendants.**

No. 97 Civ. 0574(LAK),
98 Civ. 8845(LAK).

United States District Court,
S.D. New York.

Sept. 17, 1999.

---

Victor John Geraci, Fitzpatrick, Cella, Harper & Scinto, New York, NY, for Bear U.S.A., Inc., plaintiff.

Andrew T. Hahn, Winston & Strawn, New York, NY, S. Henry Cho, New York, NY, for William Kim, Dura-Tex, Inc., Family Off Price Shop, Inc., Shoe Tree, Inc., defendants.

David A. Stern, Howard M. Davis P.C., New York, NY, for Suk J. Kong, Midwest International Trading, Inc., defendants.

## OPINION

KAPLAN, District Judge.

Last winter, for the third holiday season, Bear U.S.A., Inc. ("Bear U.S.A.") alleged that the trademarks on its popular "Bear" parkas were being infringed. The Court now decides two separate but related motions: one for contempt of an earlier judgment and the other for a preliminary injunction in a new case. The accused parkas have been seized, and the Court has issued a temporary restraining order in the new case.[1]

*Facts*

*The Parties*

*Bear U.S.A.*

The Hong family,[2] which now owns Bear U.S.A., started out in the retail clothing and footwear business in approximately 1987.[3] After some years, they began selling parkas made to their order under the

---

**1.** *See* Dec. 15, 1998 Order, *Bear U.S.A. v. Bing Chuan Group U.S.A. Corp.*, 98 Civ. 8845.

**2.** Thomas Hong Dec. 14, 1998 Aff. ¶ 2.

**3.** *See Bear U.S.A. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp. 896, 899 (S.D.N.Y.1995).

trademark "Bear Mountain." Their first line of clothing was a great success and the business grew rapidly.[4] In 1994, they incorporated the company as Bear U.S.A., which succeeded to the family's rights in the marks. Members of the Hong family continue to run the new corporation.[5]

As the company grew, Bear U.S.A. developed a group of trademarks to identify its products to consumers. As noted, "Bear Mountain" was its first mark. The second generation included two marks, one with the word "Bear," the other with the words "Bear U.S.A.," each next to a line drawing of a polar bear. The third generation of marks added two new marks which combined the words and the drawing by enclosing the word "Bear" or words "Bear U.S.A." within the outline of the polar bear. Eventually, Bear U.S.A. added a final "Bear Max" mark. In all, there now are six Bear U.S.A. marks. "Bear Mountain" is not a registered mark, "Bear–Max" is federally registered and the four remaining marks have federal trademark applications pending.[6]

Bear U.S.A. invests tens of thousands of dollars in advertising and promotion of its goods and its marks.[7] In addition to the company's own efforts, national publications such as *GQ*, *Seventeen*, and *Details* have featured its products.[8] Mary J. Blige, Junior M.A.F.I.A., Dr. Dre and others who, the Court is informed, are recording artists and celebrities, request Bear U.S.A. merchandise. Television shows such as "New York Undercover" and "The Fresh Prince of Bel Air" use Bear U.S.A. products on their shows.[9]

### William Kim

William Kim is the principal of Dura–Tex, Inc. ("Dura–Tex"), a company which commissions the manufacture of and distributes down parkas. Kim is a defendant in both of the cases addressed in this opinion and is subject to a permanent injunction in the earlier case. Kim designed, ordered, and sold many of the accused "Bear Mountain" parkas at issue in this case.

### Bing Chuan

Defendant Bing Chuan Group U.S.A. Corporation is the United States subsidiary of a large conglomerate based in the People's Republic of China. The parent company manufactures and sells men's and women's clothing. Bing Chuan U.S.A. imports merchandise produced by the parent company into the United States.[10] In this opinion, the entire Bing Chuan operation in the United States and abroad is referred to collectively as "Bing Chuan." Bing Chuan manufactured the "Bear Mountain" parkas at issue here.

### The Litigation Before this Court

This opinion addresses distinct issues in two separate, though related, cases: a charge of contempt of the judgment in *Bear U.S.A., Inc. v. William Kim,* 97 Civ. 0574, and alleged trademark infringement in *Bear U.S.A., Inc. v. Bing Chuan Group, Inc.,* 71 F.Supp.2d 237 (S.D.N.Y.1999). In analyzing each claim, the Court has taken care to consider only the facts of record in that claim. It nonetheless is helpful to refer first to the overall background in order to set the case in context.

### The A.J. Sheepskin Case

Bear U.S.A. first appeared in this Court during the holiday shopping season of 1995, when it sued Theodore Held and Simon Akiva, and their respective companies, A.J. Sheepskin & Leather Outerwear

---

4. Thomas Hong Dec. 14, 1998 Aff. ¶ 4.

5. *Id.* at ¶ 5.

6. *Id.* at ¶¶ 6—10. Plaintiff has registered the four marks consisting of either "Bear" or "Bear U.S.A." next to or inside a drawing of a polar bear in New York State. *Id.* at ¶ 11.

7. *Id.* at ¶¶ 18—19.

8. *Id.* at ¶ 21.

9. *Id.* at ¶ 20.

10. Gary Tao Aff. ¶¶ 2—5.

and Inner City Jeans & Sportswear, Ltd.[11] Held, Akiva and their companies originally bought Bear U.S.A. parkas and jackets from the Hong family. After seeing the Hongs' success with the Bear marks, this Court found, the defendants in *A.J. Sheepskin* decided to capitalize on that success by bringing out a line of denim jeans and other items which also used "bear" names:[12] "Bear Jeans" on denim jeans, shirts, and light jackets, "Bear Tex by Bear Jeans" on down jackets, and "Bear Tex" with a smaller "Bear Jeans" on boots.[13] Nor was this their first experience knocking off others' products. These defendants previously had been enjoined from infringing the marks of two other clothing manufacturers, North Face and Guess?.[14]

*A.J. Sheepskin* ended on December 21, 1995, when both sides consented to an injunction. The defendants and those in active concert with them were permanently enjoined from, among other things, infringing Bear U.S.A.'s trademarks or using any colorable or confusingly similar imitation of them.

While the 1995 case spelled the end of the "Bear Tex" and "Bear Jean" infringements, it did not end Bear's problems with these defendants. Within a year, the defendants in *A.J. Sheepskin* had found a new business partner, William Kim. Held, Akiva, and Kim had known each other for a number of years;[15] Held, for example, had worked for several years on prior clothing companies with Kim.[16] Even as they were settling Bear U.S.A.'s case against them, Held later would testify, "[they] were looking for other Bear marks to use."[17]

### The First Infringing "Bear Mountain" Mark

Held knew from a trademark search that a corporation called Shoe Tree had registered the trademark "Bear Mountain" for use on footwear.[18] Shoe Tree operated a small retail and wholesale shoe store in Millersburg, Pennsylvania,[19] where Shoe Tree's owner and manager, Andrew Crawford, sold boots with a "Bear Mountain" mark. The logo on those boots, it should be noted, bore no resemblance to the manner in which Bear U.S.A. used "Bear Mountain" and "Bear." Nor did Crawford sell any parkas under the "Bear Mountain" name.[20]

Held hoped to license Shoe Tree's "Bear Mountain" mark but did not disclose that fact to Bear U.S.A. during the settlement negotiations.[21] He and Akiva met with Crawford and tried to convince him to license the trademark to them,[22] but Crawford was not interested because he did not like and was not comfortable with Held.[23] Kim, however, had better luck. He too

**11.** *See generally Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp. 896 (S.D.N.Y.1995) ("*A.J.Sheepskin*").

**12.** *Id.* at 900.

**13.** *Id.* at 902.

**14.** *Id.* at 900.

**15.** *See* Held Aff. July 10, 1997, *Bear U.S.A. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp. 896 (S.D.N.Y.1995) (95 Civ. 8146) at ¶ 14; Akiva Aff. July 17, 1997, *Bear U.S.A. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp. 896 (S.D.N.Y.1995) (95 Civ. 8146) at ¶ 9.

**16.** *See* Held Aff. July 10, 1997, *Bear U.S.A. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F.Supp. 896 (S.D.N.Y.1995) (95 Civ 8146) at ¶ 14; *see also* Transcript of 1997 Trial, 97 Civ 0574, at 237. Subsequent references to the 1997 trial transcript are simply Tr. ___. References to transcripts of other proceedings include the date of the proceeding cited.

**17.** Tr. at 313.

**18.** *Id.* at 312–13.

**19.** *Id.* at 481.

**20.** *Id.* at 482.

**21.** *Id.* at 318–21.

**22.** *Id.* at 315–16, 487–90.

**23.** *Id.* at 373, 489.

went to Crawford and, when Crawford asked whether he was associated with Held, said that he was not and persuaded Crawford to license the mark to him.[24] Kim then had 200,000 parkas produced abroad with the logo "Bear Mountain." [25] Kim altered Crawford's mark, however, initially by adding the image of a bear, the same sanimal which appeared on Bear U.S.A.'s parkas.[26] He went so far as to employ a manufacturer used by Bear U.S.A. and to instruct it to make the parkas "in the Bear U.S.A. style." [27]

"Bear Mountain," as described above, was the Hongs' first "bear" trademark. Kim, Held, and Akiva pursued their "Bear Mountain" parka venture despite the fact that Held and Akiva had agreed to a consent decree in the 1995 case which barred them, and anyone in active concert with them, from "infringing, substantially imitating, or making unauthorized use of plaintiff's Bear trademarks; ... [or] using any simulation, reproduction, counterfeit, copy, colorable imitation or confusingly similar imitation of any of Bear's distinctive Bear trademarks." [28] Kim, moreover, knew about the 1995 case, because, Held testified, he had told Kim about the opinion of this Court in that case.[29] The trio persisted, however, for two reasons. First, as Held told Crawford, he believed that "anything having to do with Bear at all was working [in the] inner city." [30] Second, at the time they were producing

their "Bear Mountain" parkas, they knew that Bear U.S.A. was involved in other expensive litigation with Golden Bear, a company associated with the professional golfer, Jack Nicklaus. Crawford later suggested that they did not believe that Bear U.S.A. could afford both to defend the Golden Bear suit and to pursue an additional action against the Kim group.[31]

The parkas Kim had manufactured bore a mark in which the words "Bear Mountain" appeared under a drawing of a mountain range. The words "Bear Mountain" were printed in both upper and lower case letters in a font apparently identical to that used by Bear U.S.A. in printing "Bear" on its jackets. The word "Bear" was far more prominent on Kim's parkas than the word "Mountain." [32]

### The Kim case

When it discovered Kim's "Bear Mountain" parkas in the marketplace, Bear U.S.A. brought the first litigation now before this Court, the *Kim* case, during the 1997 holiday shopping season. Bear U.S.A. there sued Kim, Dura–Tex, Held, Akiva, their companies, Shoe–Tree, and several of the retail stores selling the parkas.[33] Bear U.S.A.'s theory was that Kim's "Bear Mountain" mark infringed its own popular "Bear" and "Bear U.S.A." marks.[34] Held, Akiva, and the stores consented to a permanent injunction. Kim,

24. *Id.* at 491.

25. *Id.* at 781.

26. *Id.* at 938–39.

27. *Id.* at 872–77.

28. Held and Akiva appear to have been involved in Kim's "Bear Mountain" venture, at least at the beginning. Their precise role, however, is extraneous to what now is before the Court.

29. Tr. at 382.

30. *Id.* at 487.

31. *Id.* at 500–03.

32. *See* Cpt., Ex. N, *Bear U.S.A. v. William Kim,* 1998 WL 229281 (S.D.N.Y.1998) (97 Civ. 0574).

33. Bear alleged also that the sale of parkas displaying either the word "Bear" in a manner very similar to Bear U.S.A.'s parkas, or an imitation of Bear U.S.A.'s "AGPS–NT EXPEDITION" trademark, were infringing.

34. See Cpt., Ex. 19, *Bear U.S.A. v. Bing Chuan Group U.S.A. Corp.,* 98 Civ. 8845. Exhibit 19 to the Complaint in the *Bing Chuan* case contains Exhibit PX–124 from the *Kim* trial. PX–124 displayed the marks which Bear U.S.A. claimed in that case were infringed by

Dura–Tex, and other defendants not relevant here, however, went to trial before a jury. During the trial, Kim revealed that he had produced 200,000 "Bear Mountain" parkas but had sold only 100,000 of them. Another 100,000 therefore remained in inventory.[35]

On April 17, 1998, the jury found that the Bear U.S.A. trademarks were protectible,[36] that consumers were likely to be confused into thinking that the Kim "Bear Mountain" parkas came from the same source as or were approved by Bear U.S.A., and that Kim and Dura–Tex had been willfully deceptive with respect to their use of the Bear U.S.A. marks.[37] On the same day, this Court issued an order from the bench directing that "neither Mr. Kim nor Dura–Tex, nor any person in active concert or participation with them who receives actual notice of this order shall sell, assign, transfer, or alienate in any way any claim, right, title or interest that any of them may have or claim in any of the 100,000 parkas that have been referred to in the record of this trial."[38] The order referred to the as yet unsold parkas. At the Court's direction, Kim filed an affidavit on April 20, 1998, which identified Bing Chuan as the manufacturer and custodian of the "Bear Mountain" parkas.[39]

The scope of the judgment in the *Kim* case was litigated by the parties. Bear U.S.A.'s theory at trial had been that the

Kim parkas infringed upon the "Bear" and "Bear U.S.A." marks, but plaintiff sought an injunction which banned also use of the mark "Bear Mountain." On May 7, 1998, the Court issued a memorandum on judgment, explaining its decision to enjoin Kim from using "Bear Mountain" on the basis that he "should be 'fenced out' of any territory remotely approaching the line that divides proper from improper conduct with respect to the Bear U.S.A. marks."[40]

The judgment forbade Kim, his company Dura–Tex, "and all other persons acting in active concert or participation with them who receive actual notice of this judgment by personal service or otherwise"[41] from, among other things, engaging in unfair competition with Bear U.S.A. and infringement of its trademarks. The judgment enjoined these parties

"particularly from, in any manner, directly or indirectly:

"i) using the 'Bear Mountain' trademark;

"ii) using the word 'Bear' in a type style, size or any other manner which duplicates or simulates the manner in which Bear U.S.A. uses or has used its Bear U.S.A. Trademarks or in any other manner which is likely to cause confusion as to the source of their products;

\* \* \* \* \* \*

"iv) manufacturing, importing, financing, distributing, circulating, selling, offering for sale, moving or otherwise

the first generation of Kim "Bear Mountain" parkas.

**35.** Tr. 781.

**36.** It was not asked to make a finding as to Bear U.S.A.'s "Bear Mountain" mark.

**37.** *See* Verdict Form, *Bear U.S.A. v. Kim*, 1998 WL 229281 (S.D.N.Y.1998) (97 Civ. 0574). The jury found the same as to the use of the AGPS–NT expedition mark.
The verdict form refers to the "Kim defendants" but it is clear from the jury instructions that the "Kim defendants" were William Kim and Dura–Tex. *See* Tr. 1150.

**38.** Kelly Aff. Feb. 2, 1999 Ex. 4. The Court does not rely on this order in the contempt discussion below. It is unnecessary to do so,

as both Bear U.S.A. and defendant Bing Chuan agree that the May 6 judgment is valid, and the conduct in question here occurred after Bing Chuan learned of the judgment. *See* Def. Mem. at 11. The order is, however, the first of several times that Bing Chuan was put on notice of the charges against William Kim and the possibility that the parkas it held were involved.

**39.** Kelly Aff. Feb. 2, 1999 at Ex. 3.

**40.** Memorandum on Judgment, *Bear U.S.A., Inc. v. Kim*, 1998 WL 229281 (S.D.N.Y.1998).

**41.** Judgment, *Bear U.S.A., Inc. v. Kim*, 1998 WL 229281 at 3; Kelly Aff. Feb. 2, 1999 Ex. 8.

disposing of any product bearing any simulation, reproduction, counterfeit, copy, colorable imitation or confusingly similar imitation [of] the trademarks . . . described in subparagraphs i) through iii) above;

"v) using any false designation of origin or false description (including, without limitation, any letters or symbols) which can, or is likely to, lead the trade or public, or individual members thereof, to believe that any product manufactured, advertised, distributed and/or sold by Defendants is in any manner associated or connected with plaintiff, or is sold, licensed, sponsored, approved, or authorized by plaintiff;

    \*     \*     \*     \*     \*     \*

"vii) passing Defendants products off as "Bear" or "Bear U.S.A." products; or "viii) assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs i) though vii) above." [42]

### Bear U.S.A.'s Discussions with Bing Chuan

Shortly after Bear U.S.A. learned from Kim's affidavit that Bing Chuan manufactured and then had possession of the remaining 100,000 Kim parkas, its counsel quickly informed Bing Chuan of the Court's April 17 order by a letter dated April 24, 1998 to Bing Chuan president Chuan Bo Xu.[43] That letter was followed by another on May 1, 1998, which informed

Lucianne Lew, Bing Chuan's legal counsel, of the order.[44] Attached to the May 1, 1998 letter was a transcript of the April 17 proceedings. Shortly after the May 1 letter, plaintiff's counsel and Bing Chuan's counsel spoke by phone, and Ms. Lew assured Bear U.S.A.'s counsel that Bing Chuan had no intention of moving the "Bear Mountain" parkas.[45] Ms. Lew and plaintiff's counsel then met three times in unsuccessful attempts to agree on a disposition of the 100,000 parkas.[46]

In addition to the April 17 order, there is no question that Bing Chuan received the final *Kim* judgment. In fact, Bing Chuan admits this.[47] While no documentary evidence established the date of Bing Chuan's receipt of the judgment, the Court finds that Bing Chuan had notice of the *Kim* judgment promptly after it was filed. This finding is based on the community of interest between Bing Chuan and Kim, the extensive discussions between Bear U.S.A.'s and Bing Chuan's attorneys, and the representation of one of Bear U.S.A.'s attorneys that he believes he gave Bing Chuan's counsel a copy of the judgment during a June 16, 1998 meeting.[48]

### The Origins of this Case

In December 1998, Michael McKeever, an investigator hired by Bear U.S.A., visited Bing Chuan's warehouse at 417 Hoboken Avenue in Jersey City, New Jersey.[49] While there, he watched and videotaped Kim loading boxes from the Bing Chuan warehouse into a van.[50] McKeever then followed Kim as he drove around New York and New Jersey, delivering cartons

42. *Id.* at 4.

43. Kelly Aff. Feb. 2, 1999 Ex. 5

44. *Id.* at Ex. 6.

45. *Id.* at ¶ 13–14. At the hearing on the current matter, Ms. Lew tried to narrow her statement by suggesting that Bing Chuan had agreed not to sell the parkas only while the parties negotiated. *See* Tr. 4/5/99 at 22–24. She testified, however, that at no time did either Bing Chuan or Bear U.S.A. say that negotiations were over. In fact, she testified that they had tried to meet even after litiga-

tion in the *Bing Chuan* case had begun. Tr. 4/5/99 at 23.

46. Kelly Aff. ¶¶ 14–15.

47. Def. Mem. at 11 ("Bing Chuan sold approximately 16,750 coats to Dura–Tex and/or William Kim after receiving notice of the Judgment.").

48. Supp. Aff. Razzano ¶¶ 4–5.

49. McKeever Aff. ¶ 3.

50. *Id.* at ¶ 5.

of goods marked "Bear Mountain" to various retailers.[51]

### The Second Generation of Infringing "Bear Mountain" Parkas

Another investigator hired by Bear U.S.A., Michael Ciorciari, then purchased some of the Bing Chuan "Bear Mountain" parkas from retailers.[52] While the exact date they were produced is unclear, the marks on these parkas had evolved from the Kim "Bear Mountain" mark considered by the jury in the *Kim* case. As discussed above, the *Kim* jury had considered parkas on which the words "Bear Mountain" appeared beneath a line drawing of mountain range. The word "Bear" was far more prominent than the word "Mountain," and the words appeared in the same font used by Bear U.S.A. Two new versions of the mark were on the parkas that Ciorciari purchased in 1998. In one version, the words "Bear Mountain" still appeared beneath a mountain range symbol. The words were printed, however, entirely in capital letters, the font differed from the one used by Bear U.S.A., and both words were equally prominent. In addition, after the word "Bear" in "Bear Mountain" a small "TM" trademark symbol appeared.[53] In a second new version, the logo just described (all capital letters, both words of equal prominence, etc.) appeared together with a triangular symbol saying "B M Gear."[54]

After watching Kim distribute "Bear Mountain" parkas once again, and facing infringements during another holiday shopping season, Bear U.S.A. acted on two separate tracks.

First, it moved to hold Bing Chuan and Kim in contempt of the Court's May 6, 1998 judgment in the *Kim* case. Kim defaulted on this motion and the Court entered a contempt order against him. The Court heard argument and testimony at two separate hearings on the contempt motion.

Second, Bear U.S.A., filed No. 98 Civ. 8845, (the "*Bing Chuan* case") in which it charges Bing Chuan with trademark infringement, unfair competition and dilution. Bear U.S.A. there moved for a preliminary injunction against both Kim and Bing Chuan.[55] Kim defaulted on this motion too, and the Court entered a preliminary injunction against him. The motion to enjoin Bing Chuan remains. The Court also issued an ex parte temporary restraining order permitting seizure of the allegedly infringing parkas and heard and denied a motion to vacate the seizure order.[56] The Court has heard argument and testimony at two hearings on the preliminary injunction motion as well.

Thus, two motions are before the Court: the motion to hold Bing Chuan in contempt of the judgment in the *Kim* case and the motion for a preliminary injunction in the *Bing Chuan* case.

### Discussion

I. *The Contempt Motion*

A. *Liability*

1. *Active Concert or Participation*

█ Bing Chuan suggests first that it should not be held in contempt for selling

51. *Id.* at ¶¶ 6—9.

52. *See generally* Feb. 2, 1999 Ciorciari Aff. Ciorciari could tell the "Bear Mountain" parkas in the store had been produced by Bing Chuan not only by the "Bear Mountain" markings, but also by the RN number, a number issued to each manufacturer by the Federal Trade Commission. *Id.* at ¶¶ 8—9.

53. *See* Cpt. Ex. 26, 98 Civ. 8845, *Bear U.S.A. v. Bing Chuan.*

54. *See* Cpt. Ex. 26, *Bear U.S.A. v. Bing Chuan,* 98 Civ. 8845, Ciorciari Dec. 14, 1998 Aff. Exs. 7, 13.

55. Bear U.S.A. sought also injunctions against the merchants. They are not addressed here, since defendants John Doe d/b/a Just for You, Momo St. Nicholas, Inc. d/b/a New York Sports, and John Doe d/b/a Headquarters, all stipulated to preliminary injunctions.

56. See Order Dec. 30, 1998, *Bear U.S.A. v. Bing Chuan,* 98 Civ. 8845.

the jackets at issue here because it was not a party to the *Kim* case.

Bing Chuan is correct in the general assertion that no injunction binds the world. It is wrong, however, in thinking that the injunction in the *Kim* case binds only the parties in that case. Federal Rule of Civil Procedure 65 dictates that "[e]very order granting an injunction is binding ... upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order."[57] Rule 65 simply "'codif[ies] the common-law doctrine "that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."'"[58] That principle has been clear at least since *Alemite Manufacturing Corp. v. Staff*,[59] when Judge Learned Hand explained that a judgment binds not only the parties, but also "a person not a party ... when he has helped to bring about ... an act of a party [forbidden by the judgment]."[60] Two questions, then, are relevant here. First, did Bing Chuan know of the judgment? Second, was Bing Chuan in active concert or participation with a party to the *Kim* case?

The answer to the first question is straightforward. Bing Chuan admits that it knew of the judgment.[61] Even if it did not admit it, the Court independently has so found.

The question of active concert or participation is only slightly more complex. Bing Chuan knew that Kim was enjoined from selling "Bear Mountain" parkas. Since Bing Chuan had custody of the parkas, Kim needed its cooperation even to access the jackets. Knowing of the injunction, Bing Chuan nonetheless enabled Kim to violate it by selling parkas to and through Kim from the inventory it held. Bing Chuan to that extent acted in active concert or participation with Kim.[62]

### 2. A Clear and Unambiguous Order

◼ To hold a party in contempt, a plaintiff must prove "by 'clear and convincing evidence' that the party violated a 'clear and unambiguous' order of the court. [Citation omitted] The violation need not be willful, but it must be demonstrated that 'the contemnor was not reasonably diligent in attempting to comply.'"[63] A clear and unambiguous order is one "'specific and definite enough to apprise those within its scope of the conduct that is being proscribed'"[64] and which permits a reader "to ascertain from the four corners of the order precisely what acts are forbidden."[65]

◼ Bing Chuan suggests that the language of the judgment was insufficiently clear to make the company aware that its conduct in making the "Bear Mountain" jackets available to Kim was forbidden. It argues that the language "the 'Bear Moun-

**57.** FED. R. CIV. P. 65(d).

**58.** *See Doctor's Associates, Inc., v. Reinert & Duree, P.C.*, 191 F.3d 297 (2d Cir.1999), *citing Heyman v. Kline*, 444 F.2d 65, 66 (2d Cir. 1971).

**59.** 42 F.2d 832 (2d Cir.1930).

**60.** *Id.* at 833.

**61.** Def. Mem. at 11.

**62.** It is important to note that this is the only respect in which Bing Chuan even arguably acted contumaciously. Plaintiff concedes that sales of the parkas by Bing Chuan without Kim's involvement did not violate the injunction.

**63.** *City of New York v. Local 28, Sheet Metal Workers' Int'l Assoc.*, 170 F.3d 279, 282 (2d Cir.1999).

**64.** *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990).

**65.** *Drywall Tapers and Pointers, Local 1974 v. Local 530, Operative Plasterers and Cement Masons Int'l Ass'n*, 889 F.2d 389, 395 (2d Cir.1989), *cert. denied* 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990).

tain' trademark" clearly prohibited use only of the genuine "Bear Mountain" trademark, not the modified version used on the jackets Bing Chuan produced. The argument is without merit.

The judgment in the *Kim* case forbade Kim and anyone in active concert with him from "using the 'Bear Mountain' trademark" [66] and from "manufacturing, importing, financing, circulating, selling, offering for sale, moving or otherwise disposing of any product bearing *any* simulation, reproduction, counterfeit, copy, colorable imitation or confusingly similar imitation [of] the trademarks ... described ... above." [67] The language is unambiguous. It bars manufacture or sale of a product bearing *any* simulation, colorable imitation or confusingly similar imitation of the "Bear Mountain" trademark.

This language clearly communicated what is forbidden. It is not necessary to anticipate and name every variation on a trademark that a creative infringer might use in order to skirt a judgment. The Supreme Court long ago said that a defendant whose conduct is constrained by a judgment may not avoid a contempt citation simply because the judgment does not predict and describe his conduct in detail. "Such a rule," the Court wrote, "would give tremendous impetus to [a] program of experimentation with disobedience of the law which we condemn[ ]." [68] And the law remains the same. An infringer, for example, may not claim that he or she is outside the scope of an injunction by changing a letter or a detail of an enjoined mark.[69] Injunctions necessarily rely on descriptive language, and the language relevant here—"*any* simulation, reproduction, counterfeit, copy, colorable imitation or confusingly similar imitation"—clearly communicates that the injunction forbids use not only of the genuine trademark but also of simulations or imitations of it.

The judgment unambiguously prohibited Bing Chuan's conduct in helping Kim to distribute these parkas in a second respect. It barred use of letters or symbols "which can ... lead the trade or public ... to believe that any product ... distributed and/or sold by Defendant [Kim] is in any manner associated or connected with [Bear U.S.A.]" [70] As discussed more fully below, placement of a "TM" after the word "Bear" in defendant's "Bear Mountain" logo suggested that defendant's parkas were associated with a prominent source of "Bear" goods. The evidence suggests and the Court finds that Bear U.S.A. is and was well known to parka consumers simply as "Bear." [71] In these circumstances, the

**66.** Judgment, *Bear U.S.A. v. William Kim*, 1998 WL 229281 at ¶ 14i.

**67.** *Id.* at ¶ 14 (emphasis added).

**68.** *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949). The Court went on to describe the way in which such an approach would "operate to prevent accountability for persistent contumacy. Civil contempt is avoided today by showing that the specific plan adopted by respondents was not enjoined. Hence a new decree is entered enjoining that particular plan. Thereafter the defendants work out a plan that was not specifically enjoined. Immunity is once more obtained because the new plan was not specifically enjoined. And so a whole series of wrongs is perpetrated and a decree of enforcement goes for naught." *Id.*

**69.** *See Eskay Drugs, Inc. v. Smith, Kline & French Laboratories*, 188 F.2d 430, 431 (5th Cir.1951) ("The injunction in this case perma-

nently enjoined appellants ... from using the word 'Eskay' or any colorable imitation thereof.... Appellants do not necessarily have to use the identical word to invade the rights of appellee.... That is the reason the injunction specifically prohibited appellants' use of any colorable imitation of the word 'Eskay'.... Appellants, by the use of the word 'Enkay' are trying to come about as close as is conceivably possible to a continuance of the word 'Eskay,' which they are prohibited from using by the final judgment. If this court permitted such an act, it would render ineffective the [governing order], which we do not intend to do.").

**70.** Judgment, *Bear U.S.A. v. William Kim*, 1998 WL 229281 at 3.

**71.** *See* note 123 *infra*.

"TM" mark on the Bing Chuan parkas improperly suggested affiliation with Bear U.S.A.[72]

Moreover, having heard the witnesses at two hearings, the Court finds that any suggestion that Bing Chuan did not understand that its conduct was forbidden by the judgment is not credible. The Second Circuit, in evaluating an alleged contemnor's claims of ambiguity, has looked also to its actions. In *Drywall Tapers and Pointers, Local 1974 v. Local 530 of Operative Plasterers*,[73] the Circuit rejected an argument of alleged ambiguity similar to Bing Chuan's when the party complaining that an injunction was too ambiguous to provide fair warning had complained previously that the same order was too harsh to comply with. Bing Chuan's actions and circumstances similarly belie its claim of inadequate warning. Upon receipt of this judgment, Bing Chuan met several times with Bear U.S.A.'s lawyers, who repeatedly told Bing Chuan that the parkas it held could not be sold consistent with the judgment. Bing Chuan did not dispute that assertion and even agreed not to sell the parkas.[74] In fact, Bing Chuan's own counsel admitted that Bing Chuan sold these parkas without her knowledge even after she, in her client's presence, committed that it would not do so.[75]

Even the company's own testimony on this motion suggests that ambiguity and inadequate warning had nothing to do with Bing Chuan's decision to sell these parkas.

While the company represented to the Court that it did not know that the judgment barred these sales, Bing Chuan's vice-president, Gary Tao, admitted that Bing Chuan sold the "Bear Mountain" parkas simply because it had invested a lot of money in their manufacture.[76] To the extent Tao, who testified in open Court, offered other reasons and justifications for the sales,[77] the Court does not credit his testimony. Instead, the Court finds that Bing Chuan sold the parkas for precisely the economic reasons which Tao cites.

In short, the order unambiguously stated that the *Kim* defendants, and those in active concert with them, were enjoined from selling goods featuring the "Bear Mountain" mark, any simulation of it or of the other Bear U.S.A. marks, or any mark which might lead the public to believe that a product was associated with Bear U.S.A. The Court finds that Bing Chuan had notice of the judgment, and it does not credit Bing Chuan's suggestion that it sold the Kim "Bear Mountain" parkas because it believed those sales were permitted. Instead, the Court finds that Bing Chuan sold the parkas, despite knowledge of this Court's order, to avoid losing money it had invested in their manufacture and in full knowledge that its actions, to the extent they involved Kim, were forbidden.

## B. *Damages*

■ Civil contempt awards are intended to coerce compliance with a court's

---

72. The Second Circuit has instructed that courts enforcing injunctions that use terms such as "confusingly similar" should not conduct an entirely new *Polaroid* analysis. *See Wella Corporation v. Wella Graphics*, 37 F.3d 46, 48 (2d Cir.1994). "When enforcing injunctions that enjoin use of any mark confusingly similar to the protected mark, courts should not adjudicate issues such as [individual *Polaroid* factors] but should simply evaluate whether or not the new mark is confusingly similar to the protected mark." *Id.* The same may be said of this injunction's bar on use of marks which suggest affiliation with Bear U.S.A. The full analysis nonetheless appears below as part of the discussion of the 1998 trademark claims.

73. 889 F.2d 389, 395 (2d Cir.1989), *cert. denied*, 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990).

74. *See* text accompanying note 45 *supra*.

75. Supp. Razzano Aff. ¶ 6.

76. Tao Aff. ¶ 18 a)—g). Tao's affidavit suggests also that Bing Chuan did not believe it was bound by the judgment and that when Bing Chuan compared one of its own parkas to one of Bear U.S.A.'s parkas, it felt its own parkas were not infringing. The Court does not credit that testimony.

77. *See id.*

order or to compensate the plaintiff for losses sustained.[78] Plaintiff, however, need not show actual losses. An award of the profits of the contemnor is an acceptable substitute for such a showing.[79]

■ The parties agree that (1) Bing Chuan sold 17,519 parkas through or to Kim after it received notice of this Court's judgment,[80] (2) the average sales price per coat was $23.70,[81] and (3) the basic costs were a total of $3,456,119 for the entire lot of 167,922 parkas manufactured, or approximately $20.58 per parka. The gross profit on those parkas therefore was $54,-659.28.

It is defendant's burden to prove its costs in order to demonstrate that net profits were lower than the stipulated gross profits.[82] Bing Chuan alleges costs incurred in paying duties, trucking and storage and export license fees. After considering the documentary evidence submitted at the hearing and hearing testimony from Bing Chuan's vice president, Gary Tao, the Court finds that Bing Chuan has not proved any of the disputed costs.

Defendant submitted Exhibit B as evidence of the costs of obtaining export licenses, or "quota," for each parka. Exhibit B contains no reference at all to quota or export licenses, as Tao admitted,[83] and bears no apparent relation to the $1.50 per jacket fee to which Tao testified.

Defendant's Exhibit C, submitted to prove customs duties allegedly paid, contains no reference to the "Bear Mountain" parkas, making it possible that some or all of the charges in the exhibit are attributable to other products. Moreover, some of the invoices included in Exhibit C are not invoices to Bing Chuan at all but rather to Sub–Zero, an entity not involved in the litigation, suggesting that Exhibit C overall is a less than reliable accounting.

Finally, Defendant's Exhibit D, submitted to prove alleged trucking and storage charges for the parkas, is devoid of references to "Bear Mountain" parkas. The exhibit contains invoices to the Bing Chuan group, but Tao testified that Bing Chuan dealt in more than the Bing Chuan parkas. These invoices could represent charges for any product.

The Court does not credit Tao's testimony. It finds that none of the disputed costs has been proved adequately. Defendant is credited only the agreed costs of $20.58 per parka. Accordingly, plaintiff is entitled to recover the sum of $54,659.28.

## C. Costs and Attorneys Fees

■ Plaintiff asks also that it be awarded the costs of prosecuting the contempt motion, including reasonable attorney's fees. Such an award is appropriate only when contempt was willful. "A willful contempt is one where the 'contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply.' "[84]

The Court finds that Bing Chuan's contempt was willful. The company had notice of and the ability to comply with the

---

**78.** *United States. v. United Mine Workers of America,* 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1352 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990).

**79.** *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 6 (2d Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990).

**80.** *See* Def. Bing Chuan's May 7, 1999 letter; Pl.'s May 7, 1999 letter.

**81.** *Id.*

**82.** *Manhattan Indus., Inc., v. Sweater Bee by Banff, Ltd.,* 885 F.2d at 7.

**83.** Tr. 4/29/99 at 51.

**84.** *New York State Nat'l Org. for Women v. Terry,* 952 F.Supp. 1033, 1044 (S.D.N.Y. 1997), *aff'd* 159 F.3d 86 (1998), *cert. denied sub nom Pearson v. Planned Parenthood Margaret Sanger Clinic,* —— U.S. ——, 119 S.Ct. 2336, 144 L.Ed.2d 234 (1999).

judgment and, in fact, complied for some period of time by ceasing its sales of the parkas. It eventually acted deliberately to violate the judgment. Having found such willful contempt, the Second Circuit has said "a district court ... would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs of the victim of contempt." [85] No such grounds are present here. The Court will award costs and reasonable attorney's fees in an amount to be determined on motion.

### D. Treble Damages

Plaintiff asks also that its award of profits be trebled in light of the willful nature of the contempt.[86] Treble damages certainly may be imposed as a means of coercing compliance with a court order.[87] But plaintiff cites no authority justifying their imposition in a civil contempt proceeding simply as a punitive measure, as would be their purpose here. Accordingly, the Court declines to award treble damages.

### II. The Preliminary Injunction Motion

Bear U.S.A. seeks also a preliminary injunction in the *Bing Chuan* case. It alleges that Bing Chuan has infringed and diluted its trademarks and engaged in unfair competition and that it threatens to continue doing so and Bear U.S.A. seeks to enjoin this conduct.

■ A party seeking a preliminary injunction must demonstrate that it (1) is threatened with irreparable injury absent an injunction and (2) either (a) is likely to prevail on the merits or (b) has raised serious questions going to the merits and the balance of hardships tips decidedly in its favor.[88]

### A. Irreparable Harm

■ In the trademark context, irreparable harm ordinarily is presumed if a plaintiff demonstrates a likelihood of consumer confusion.[89] Hence, no separate analysis of this issue is necessary.

### B. Likelihood of Success on the Merits
#### 1. Trademark Claims

Bear U.S.A. alleges that the parkas commissioned by Kim and manufactured by Bing Chuan infringe its "Bear Mountain" and other "Bear" trademarks in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and New York law. As described above, the parkas feature the words "Bear Mountain" in capital letters, with a TM symbol after the word "Bear," all below an icon of a mountain range. Some also have a triangular symbol saying "B M Gear" next to the words "Bear Mountain."

To succeed on its trademark infringement claim, Bear U.S.A. must prove that "it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion.' " [90]

#### a. Entitlement to Protection

■ In determining the protectability of a mark, courts employ the classic typology articulated by Judge Friendly: putative marks are classified as (1) arbitrary or fanciful, (2) suggestive, (3) descriptive, and (4) generic.[91] Arbitrary, fanciful and sug-

**85.** *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir.1996).

**86.** *E.g., N.A. Sales Co., Inc. v. Chapman Industries Corp.*, 736 F.2d 854, 857–58 (2d Cir. 1984).

**87.** *See id.* at 857–58.

**88.** *See, e.g. Alliance Bond Fund v. Grupo Mexicano de Desarrollo, S.A.* 143 F.3d 688, 696 (2d Cir.), *rev'd on other grounds,* —— U.S. ——, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999).

**89.** *Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 967 (2d Cir.1995).

**90.** *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir.1995); *see also Estee Lauder, Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508 (2d Cir.1997).

**91.** *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976).

gestive marks are inherently distinctive and thus subject to immediate protection upon commercial use.[92] Descriptive marks are protected only if they are shown to have acquired secondary meaning to consumers.[93] Generic terms never are protected.[94]

■ "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods."[95] Plaintiff's "Bear," "Bear U.S.A.," and "Bear Mountain" marks are suggestive, requiring as they do some imagination to connect the mark to the nature or qualities of the goods.[96] While the words "bear" and "mountain" might connote ruggedness and the outdoors, it takes some thought to connect these ideas with a product intended to protect the wearer from the elements. A customer must make a mental leap to determine that "Bear" or "Bear Mountain" is the mark of a parka or jacket. As suggestive marks, Bear U.S.A.'s trademarks are protectible without proof of secondary meaning.[97]

### b. Likelihood of Confusion

■ The next question is whether defendant's activities infringed plaintiff's trademarks. The crucial issue in determining infringement on both the Lanham Act and state law claims is whether a likelihood of confusion as to source existed between the two products.[98] In determining likelihood of confusion, the Court applies the familiar *Polaroid* factors: (1) strength of the senior user's mark, (2) degree of similarity between the marks, (3) proximity of the products, (4) likelihood that the senior user will bridge the gap, (5) evidence of actual confusion, (6) defendant's bad faith, (7) quality of defendant's products, and (8) sophistication of the relevant consumer group.[99]

The Bear U.S.A. marks relevant for this inquiry—"Bear Mountain," on the one hand, and "Bear" and "Bear U.S.A.," on the other—are analyzed separately, as the relevant considerations are not identical in each case.

### i. The "Bear Mountain" Mark

■ *Strength of the Senior User's Mark.* "Bear Mountain" was the first mark used by the Hongs in the business that would become Bear U.S.A. Although Bear U.S.A. has used the mark continuously since 1993, sales of "Bear Mountain" products are not substantial.[100] It has not been advertised extensively. In short, "Bear Mountain" is not a strong mark.

*Degree of Similarity Between the Marks.* The degree of similarity between the mark on plaintiff's "Bear Mountain" parkas and the one on Bing Chuan's "Bear Mountain" parkas is low. The words on

---

92. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Abercrombie,* 537 F.2d at 10–11.

93. *E.g., Abercrombie,* 537 F.2d at 10.

94. *Id.* at 9.

95. *Id.* at 10.

96. The Court so held as to the "Bear" and "Bear U.S.A." marks in *A.J.Sheepskin,* 909 F.Supp. at 903.

97. Bing Chuan suggests that sales of plaintiff's "Bear Mountain" products are low and that the mark therefore deserves less protection. This argument is considered more properly in evaluating the strength of the mark for purposes of determining likelihood of confusion.

98. *Thompson Medical Co., Inc. v. Pfizer,* Inc., 753 F.2d 208, 213 (2d Cir.1985); *American Footwear Corp. v. General Footwear Co. Ltd.,* 609 F.2d 655, 664 (2d Cir.1979), cert. denied, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980) ("[t]he test, under both the Lanham Act and the common law, is the likelihood that the consuming public will be confused as to the source of the allegedly infringing product").

99. *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), cert. denied 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

100. Plaintiff's counsel admitted at oral argument that "[t]here is not a lot of use" of the "Bear Mountain" mark. Tr. Apr. 5, 1999, at 36.

each are the same, but the appearances of the marks are dissimilar. The type fonts are different and plaintiff's design has an old-fashioned look to it while defendant's is sparer and more graphic. In plaintiff's mark, the words "Bear Mountain" appear below a detailed picture of a duck taking flight and the words "Outdoor Travel Outfitters."[101] In defendant's mark, the words appear below a simple line drawing of a mountain ridge. Those of defendant's parkas featuring the additional, triangular symbol next to the words "Bear Mountain" look even less similar.

Infringement analysis focuses on the overall impression of a mark, including the impression it makes against its surroundings. As Professor McCarthy has written, courts analyzing potential infringements "will consider the similarity of the total trade dress context in which those marks appear. The total effect of 'background' ... will be compared to see if that background is likely to intensify or dilute possible confusion between marks."[102]

In the exhibits before the Court, plaintiff's "Bear Mountain" mark appears only on the inside collar of its vests and jackets; externally its "Bear Mountain" garments are plain.[103] Defendant's mark, on the other hand, appears much more visibly on the breast pocket area of each parka, as well as on the inside collar.[104] The overall impression of the Bear U.S.A. "Bear Mountain" mark is dissimilar from the impression made by the Bing Chuan mark.

*Proximity of the Products and Likelihood that the Senior User will Bridge the Gap.* Both products are exactly the same— parkas. There is no gap to be bridged.

*Evidence of Actual Confusion.* Plaintiff has presented one piece of anecdotal evidence suggesting actual confusion. A dissatisfied purchaser of Bing Chuan parkas attempted to return them to Bear U.S.A.[105]

Defendant in response presented survey evidence that no confusion existed among consumers. Plaintiff, however, challenged the methodology of the survey. The Court heard testimony from Bing Chuan's survey expert and finds defendant's survey unpersuasive.[106]

In sum, there is minimal evidence of actual confusion, but such evidence as exists favors plaintiff.

*Defendants' Bad Faith.* It is important in assessing Bing Chuan's good faith or lack thereof to distinguish carefully between the contempt and preliminary injunction motions. The issue on the former

**101.** Cpt., *Bear U.S.A. v. Bing Chuan*, 98 Civ. 8845, Ex. 3.

**102.** 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADE-MARKS AND UNFAIR COMPETITION, § 23:60 (4th ed. 1996)("MCCARTHY").

**103.** Cpt. *Bear U.S.A. v. Bing Chuan*, 98 Civ. 8845, Exs 3, 8.

**104.** *Id.* at Ex. 26.

**105.** *See* Thomas Hong Supp. Aff. ¶¶ 1–3.

**106.** Among the reasons defendant's survey was unpersuasive was that it was undertaken at a single mall in Trumbull, Connecticut, a wealthy suburban community, while Bear U.S.A.'s parkas appeal primarily to young urban consumers of "hip-hop" culture. *See* Hong Aff. ¶¶ 20–21, Ex. 12 (describing, for example, a feature on Bear parkas in *The Source,* the self-described "Magazine of Hip–Hop Music, Culture & Politics," and use of the parkas by performers Mary J. Blige, Junior M.A.F.I.A., Ed Lover & Dr. Dre). To be sure, the parkas are sold in department stores, like Macy's, with nationwide outlets, but they are particularly popular among urban consumers. The survey also included too small a sample size of consumers to have statistical significance and employed questionable anti-guessing measures. Perhaps most important, defendant's expert testified that he did not test for confusion as to sponsorship or affiliation, an idea central to Bear U.S.A.'s claims. Tr. 4/29/99 at 21.

> The Court's consideration of this evidence is consistent with the Second Circuit's decision in *Schering v. Pfizer,* 189 F.3d 218 (2d Cir.1999) (surveys to establish actual confusion in Lanham Act cases are admissible under Fed.R.Evid. 803(3) as statements of then existing state of mind; methodological errors in the survey properly go to the weight of the evidence).

motion is whether Bing Chuan wilfully violated an injunction barring Kim and those in active concert and participation with him from selling the Kim "Bear Mountain" parkas, which the Court has found that it did. The issue on the preliminary injunction motion, however, is slightly different, viz. whether Bing Chuan itself intended to infringe Bear U.S.A.'s marks, i.e., to confuse the consuming public.[107] While the two inquiries certainly are related, they are not identical. For it is theoretically possible that Bing Chuan understood full well that its actions in concert with Kim violated the injunction but nevertheless did not believe that the jackets it sold infringed Bear U.S.A.'s marks.

Having recognized that possibility, the Court finds that it has no bearing here. Certainly the fact that the jury already had found in the case that Kim's sales infringed Bear U.S.A.'s marks is strong circumstantial evidence that Bing Chuan, which knew of that decision, knew that its own sales of very similar goods also would infringe. Bing Chuan, moreover, was warned many times that Bear U.S.A. believed that Bing Chuan's sale of the parkas would be infringing.

Defendant's actions upon learning of a prior user's rights in a mark can be an important indicator of good or bad faith. When a defendant faced with such information "neither fully explore[s] others' rights to [the mark in question] nor cease[s] its infringing behavior," that defendant "cannot lay claim to a 'good faith' belief that it was not infringing."[108]

Of course, it is not Bing Chuan's failure accurately to predict another's rights in a trademark which suggests bad faith. As a judge in this court has pointed out, "courts have disagreed with counsel's opinion in trademark infringement matters, but not found defendants to have acted in bad faith."[109] Instead, it is the failure to address the issue at all that is telling. Bing Chuan received many warnings from Bear U.S.A.'s counsel that it was infringing. It was entitled to challenge that conclusion, but there is no evidence before the Court that Bing Chuan seriously investigated the claim. There is no assertion, for example, of reliance on counsel's advice that Bing Chuan was not infringing. Indeed, Bing Chuan appears to have sold these jackets, after agreeing not to, without informing its own counsel and in violation of its commitment that it would not do so.[110] The totality of Bing Chuan's response to warnings of infringement was the purchase of one Bear U.S.A. jacket and comparison of it to the Bing Chuan jackets. That response was an empty gesture, not evidence of good faith.

In all the circumstances, the Court finds that Bing Chuan acted in bad faith. It intended to capitalize on the good will associated with the Bear U.S.A. marks by selling the Kim "Bear Mountain" parkas in the expectation that consumers would buy them, believing that they were genuine "Bear" products.

*Quality of Defendant's Products.* Bear U.S.A. has submitted the opinion of its president, Thomas Hong, that the Bing Chuan parkas are of lesser quality than the Bear U.S.A. parkas because the seam stitching and zippers are poor.[111] There is some evidence also that the retailer who attempted to return to Bear U.S.A. the goods bought from Bing Chuan had similar problems with poor stitching, torn seams,

---

**107.** 3 McCarthy § 23:113.

**108.** *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 754 (2d Cir.1996).

**109.** *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 1999 WL 108739 at *3 (S.D.N.Y.1999) (94 Civ. 2663).

**110.** *See* Supp. Razzano Aff. ¶ 6 (Counsel for Bing Chuan stated at December 1998 "that she was unaware that her client had continued to sell the 'Bear Mountain' parkas or dealt with Mr. Kim until Bear U.S.A. filed and served this motion.").

**111.** *See* Thomas Hong Dec. 14, 1998 Aff. ¶ 39.

and zippers.[112] Nevertheless, the evidence on quality is thin.

*Sophistication of the Relevant Consumer Group.* There has been no showing as to sophistication of the relevant consumer group.

*Likelihood of Success.* In this Circuit, the Court's finding that Bing Chuan intended to confuse and to capitalize on Bear U.S.A.'s good will gives rise to a presumption of a likelihood of confusion.[113] The theory is that one who seeks to capitalize on the good will of another by confusing the public "has more brains than scruples and will likely succeed." [114] But the presumption or, perhaps more properly, inference of likely confusion is not irrebuttable.[115] Even one acting with a bad faith intent to confuse may fail to achieve that end. In consequence, the Court must consider the defendant's intent along with the other *Polaroid* factors in making the ultimate determination as to likelihood of confusion.

The claim of infringement of Bear U.S.A.'s "Bear Mountain" mark by defendant's "Bear Mountain" jackets is one of the rare cases in which, the Court concludes, there is no appreciable likelihood of confusion despite Bing Chuan's intentions. The Bear U.S.A. "Bear Mountain" mark is not strong, and the mark on defendant's parkas gives a different overall impression than the mark on plaintiff's parkas. The other factors weighing in favor of a finding

of infringement do not weigh heavily enough to overcome the relative weakness of plaintiff's mark and the limited similarity shown.[116]

### ii. The "Bear" and "Bear U.S.A." Marks

■ Bear U.S.A. has alleged also that Bing Chuan's parkas infringe its "Bear" and "Bear U.S.A." marks. The foregoing discussion of proximity of the products, likelihood of bridging the gap, evidence of actual confusion, defendant's bad faith, quality of defendant's products, and sophistication of the relevant consumer group applies equally here. The strength of the senior user's "Bear" and "Bear U.S.A." marks and the degree of similarity between the marks, however, differs significantly and is discussed separately below. In addition, plaintiff presses a second theory of infringement with respect to its "Bear" and "Bear U.S.A." marks. The Lanham Act protects trademark holders not only against confusion as to source, but also against confusion "as to the affiliation, connection or association" of the defendant's product with the plaintiff's product.[117] Plaintiff argues that Bing Chuan's use of the word "Bear" followed by a "TM" on its "Bear Mountain" jackets falsely suggested that defendant's products are affiliated with Bear U.S.A. and in so doing infringed its mark.

*Strength of the Senior User's Mark.* The "Bear" and "Bear U.S.A." marks are considerably stronger than plaintiff's "Bear

---

**112.** Supp. Aff. Thomas Hong ¶ 4.

**113.** *See Samara Brothers, Inc., v. Wal–Mart Stores, Inc.*, 165 F.3d 120, 127 (2d Cir.1998); (intentionally deceptive conduct gives rise to presumption of actual confusion); *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Foundation*, 926 F.2d 134, 140 (2d Cir. 1991) (same); *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987); *A.J. Sheepskin*, 909 F.Supp. at 908 (S.D.N.Y.1995) (citing *Paddington Corp. v. Attiki Importers and Distributors*, 996 F.2d 577, 586 (2d Cir.1993); *Warner Bros. Inc., v. American Broadcasting Cos.*, 720 F.2d 231, 246–47 (2d Cir.1983)*).*

**114.** *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 466 (4th Cir.1996).

**115.** *See Resource Developers, Inc.*, 926 F.2d at 140

**116.** This conclusion in no way conflicts with the finding of the jury in the *Kim* case. That jury considered whether Bear U.S.A.'s "Bear" and "Bear U.S.A." marks, not its "Bear Mountain" mark, were infringed. Moreover the infringing parkas in the *Kim* case featured a slightly different mark than the parkas at issue now in the *Bing Chuan* case. *See* text accompanying notes 34, 53–54.

**117.** 15 U.S.C. § 1125(a)(1)(A) (West 1998).

Mountain" mark. As far back as December 1995, this Court found that these marks were strong.[118] Since then, Bear U.S.A. has continued to advertise and promote the marks, sell products under them very successfully, and protect the marks by litigating against infringers, a number of whom have consented to injunctions. The marks are strong, indeed stronger than they were in 1995.

Bing Chuan's contention that the "Bear" mark is not strong in light of the existence of approximately two hundred and twenty-five other applications and registered marks for clothing which include the word "bear" is not persuasive. The argument fails to focus on the relevant universe. Only seven of the two hundred and twenty five names submitted by defendant are active marks or pending applications using the word "bear" on jackets or parkas.[119] The rest are not used on clothing, abandoned, canceled, expired, simply intent-to-use applications or Bear U.S.A.'s own pending applications.[120] The probative value of these applications and registrations is small.[121] Moreover, evidence of third party registrations, in contrast to evidence of third party usage in the marketplace, is not persuasive evidence that a mark is weak.

> "The significance of third party [registrations of] trademarks depends wholly upon their usage. Defendant introduced no evidence that these trademarks were actually used by third parties, that they were well-promoted or that they were recognized by consumers ... '[T]he existence of these registrations is not evidence of what happens in the marketplace or that consumers are familiar with their use.' "[122]

There was no showing, for example, that any of the seven products using "bear" on parkas or jackets was in the marketplace at the time of the events in this case. Nor has there been a showing that these marks were not also infringing marks. Hence, the evidence relied upon by Bing Chuan is not persuasive evidence of the weakness of Bear U.S.A.'s marks.

*Degree of Similarity Between the Marks.* The appearance of the "Bear Mountain" mark on Bing Chuan's parkas is not particularly like that of plaintiff's "Bear" and "Bear U.S.A." marks. The marks use different fonts, and defendant's mark has both the word "Mountain" and the icon of a mountain range, neither of which appears in plaintiff's "Bear" and "Bear U.S.A." marks. Some of defendant's marks are accompanied by an additional triangular symbol. Defendant's mark, however, does suggest affiliation, connection or association with Bear U.S.A. The Court finds that the single word "Bear," used in connection with parkas, is quite strongly identified by consumers with Bear U.S.A.'s products.[123] This is not surprising since the word "Bear" appears prominently and essentially alone, but for a small "U.S.A.," on many Bear U.S.A.

---

118. *A.J. Sheepskin,* 909 F.Supp. at 905.

119. See Doyle Aff. ¶ 4.

120. *Id.* at ¶ 3.

121. *See, e.g., W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 661 (2d Cir.1970) (existence of third party uses of word "Trim" did not dilute strength of "Trim" marks on manicure tools when third party uses were on different products).

122. *Scarves by Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167, 1173 (2d Cir.1976); *see also* McCarthy 11:89 ("Third party registrations are not evidence of use 'so as to have conditioned the mind of prospective purchasers.' "); *but see Estee Lauder v. The Gap, Inc.,* 108 F.3d 1503, 1510 (2d Cir.1997) (distinctiveness of mark undermined by many registrations and pending applications for registration).

123. Magazines describing Bear U.S.A.'s products to consumers, for example, often refer to them simply as "Bear" jackets or "jackets by Bear." See, e.g., Cpt, *Bear U.S.A. v. Bing Chuan,* 98 Civ. 8845, Ex. 14 (*GQ* article referring to "nylon jacket by Bear"); Cpt. Ex. 16 (article from *The Source* describing a "reversible bubble jacket by Bear").

products.[124] Defendant's placement of a "TM" after the word "Bear" in its "Bear Mountain" mark is an additional misleading feature for which defendant has offered no explanation at all [125] and which tends to suggest that the "Bear Mountain" jacket is connected to some "Bear" product. The logo "BearᵀᴹTM Mountain," which is the way in which the accused mark appears on defendant's parkas, is likely to suggest affiliation, connection or association with Bear U.S.A.'s products and therefore probably violates the Lanham Act.

This conclusion is even stronger when the entire impression of the mark on the Bing Chuan "Bear Mountain" parkas is compared to that of the mark on the "Bear" parkas of plaintiff. Unlike plaintiff's "Bear Mountain" line of jackets, plaintiff's "Bear" and "Bear U.S.A." parkas have logos on the exterior. The logos on defendant's parkas are placed in the same spots as those on plaintiff's "Bear" parkas, namely the breast pocket area of the jacket and the inside of the collar.[126] This placement enhances the similarity in appearance between plaintiff's goods and defendant's goods and the likelihood that consumers will be confused into thinking

that defendant's product emanates from the same source as plaintiff's.[127]

*Likelihood of Success.* As suggested above, Bing Chuan deliberately sought to capitalize on the good will associated with plaintiff's "Bear" and "Bear U.S.A." marks and thus acted in bad faith. In consequence, likelihood of confusion is presumed. Moreover, the other *Polaroid* factors here confirm that inference, in contrast to the situation involving the claim of infringement of plaintiff's "Bear Mountain" mark. In light of all the *Polaroid* factors, particularly defendant's bad faith, the strength of the "Bear" marks, and the suggested affiliation between plaintiff's "Bear" and "Bear U.S.A." marks and Bing Chuan's "Bear Mountain" mark, the Court finds that Bear U.S.A. has demonstrated a likelihood of success in proving likelihood of confusion, and thus of proving its trademark infringement claims, with respect to the "Bear" and "Bear U.S.A." trademarks. In any case, plaintiff has proven that there are serious questions going to the merits and, in light of defendant's bad faith and the threatened irreparable injury, that the balance of the hardships tips decidedly in plaintiff's favor.[128]

---

124. *See id.* at Ex. 8.

125. The Second Circuit has said that the "failure to offer a 'credible innocent explanation'" for use of a mark may be evidence of bad faith. *ISCYRA v. Hilfiger,* 80 F.3d 749, 753 (2d Cir.1996).

126. *See* Cpt., *Bear U.S.A. v. Bing Chuan,* 98 Civ. 8845, Ex. 6, 8.

127. The Second Circuit has found that, in certain limited instances, differing logos are enough to distinguish two products which have the same trade dress. *See Bristol–Myers Squibb v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1046 (2d Cir.1992) (prominent placement of "Tylenol" name counters suggestion that defendant intended to create confusion with "Excedrin," despite similarity of trade dress). The Circuit recently has clarified, however, that the ability of words alone to prevent confusion between products with similar trade dress is limited to very well known names. *See Fun–Damental Too, Ltd. v. Gemmy Industries Corp.,* 111 F.3d 993, 1003 (2d

Cir.1997) (where marks are not "well-known trade names [such as Excedrin and Tylenol] ... the district court had ample ground for concluding that consumers are more likely to remember the [product's] packaging than its name.")

128. Plaintiff's complaint alleges three other claims: dilution under the Lanham Act, Section 43(c), 15 U.S.C. § 1125(c), unfair competition under New York General Business Law 368–d, and unlawful deceptive acts under New York General Business Law Section 349. Virtually nothing—less than two pages in one brief—has been written about these claims by the parties. Outcome determinative issues, such as whether Bear U.S.A. holds a famous trademark qualifying for the protection of 15 U.S.C. § 1125(c), or whether blurring or tarnishment sufficient to constitute dilution under Section 368–d has occurred, have not been briefed. In light of the Court's decision on the trademark claims, these claims are not necessary to decide the preliminary injunction motion and the Court declines to consid-

### Conclusion

Plaintiff's motion to hold Bing Chuan in contempt of the judgment in *Bear U.S.A., Inc v. William Kim, et al.*, 97 Civ. 0574 is granted. Plaintiff shall have judgment against Bing Chuan in the amount of $54,-659.28 plus costs and attorneys fees.

The Court finds that Bear U.S.A. has demonstrated a threat of irreparable injury and a likelihood of success on the merits on its trademark claims in the Bing Chuan case with respect to the "Bear" and "Bear U.S.A." trademarks. Alternatively, the Court finds that Bear U.S.A. has demonstrated serious questions going to the merits and that the balance of equities tips sharply in its favor and on that basis grants the preliminary injunction. Plaintiff's motion for a preliminary injunction in 98 Civ. 8845 therefore is granted in the form set forth in a separate order.

Settle orders on notice.

SO ORDERED.

er them without the benefit of adequate brief-

